Ronald O. PELLETIER,
Plaintiff–Appellant,

v.

Gary D. ZWEIFEL, Defendant–Appellee.

Ronald O. PELLETIER,
Plaintiff–Appellee,

v.

Gary D. ZWEIFEL,
Defendant–Appellant.

Nos. 89–8334, 89–8667.

United States Court of Appeals,
Eleventh Circuit.

Jan. 29, 1991.

Herbert P. Schlanger, Atlanta, Ga., for Ronald O. Pelletier.

Robert E. Hicks, Robert A. Bartlett, Hicks, Maloof & Campbell, Atlanta, Ga., for Gary D. Zweifel.

Before TJOFLAT, Chief Judge, JOHNSON and ANDERSON, Circuit Judges.

TJOFLAT, Chief Judge:

Rule 11[1] of the Federal Rules of Civil Procedure requires district courts to sanction attorneys and the parties they are representing when they prosecute baseless claims. The sanction must be appropriate and may include "the reasonable expenses incurred" because of the prosecution, such as a reasonable attorney's fee. When a party prosecutes a frivolous appeal, Rule 38[2] of the Federal Rules of Appellate Procedure authorizes the court of appeals to

---

1. For the text of Rule 11, see *infra* p. 1513.

2. For the text of Rule 38, see *infra* p. 1523.

award the appellee "just damages and single or double costs."

In this case, Ronald O. Pelletier and his attorney, Herbert P. Schlanger, prosecuted a baseless set of claims against Gary D. Zweifel in the district court. The court rejected Pelletier's claims; it dismissed some of them by granting Zweifel's motion to dismiss for failure to state a claim for relief and the remainder by granting Zweifel's motion for summary judgment. After the district court disposed of all of Pelletier's claims, Zweifel moved the court, pursuant to Rule 11, to impose sanctions on the ground that the claims presented against him were baseless and had been brought in bad faith. The court denied his motion.

Pelletier now appeals. He contends that the district court erred in dismissing some of his claims and, with respect to other claims, in granting Zweifel summary judgment; according to Pelletier, these claims are well founded in the law, and have sufficient factual support to withstand summary disposition. Zweifel also appeals.[3] He contends that the district court abused its discretion in refusing to sanction Pelletier and Schlanger under Rule 11.

We affirm the district court's orders of dismissal and of summary judgment. We reverse, however, the district court's order denying Zweifel Rule 11 relief. The claims Pelletier and Schlanger brought against Zweifel are baseless and, moreover, were prosecuted in bad faith. We accordingly remand the case for the imposition of such sanctions as will recompense Zweifel for the expenses that he incurred, including attorney's fees, in defending this suit in the district court. The appeal Pelletier and Schlanger brought to this court is frivolous. Therefore, pursuant to Rule 38, we award Zweifel double costs and attorney's fees, which shall be assessed by the district court on remand, when it imposes the Rule 11 sanctions.

We organize this opinion as follows. In part I, we set forth the facts, reading Pelletier's complaint[4] in the light most favorable to him, with respect to the claims dismissed under Fed.R.Civ.P. 12(b)(6), and giving him the benefit of every reasonable inference, with respect to the claims disposed of on summary judgment under Fed. R.Civ.P. 56. In part II, we address the merits of the claims the district court rejected on summary judgment, demonstrating that those claims are indeed baseless. In part III, we address the claims that Pelletier contends the district court should not have dismissed for failure to state a claim for relief, demonstrating that they are likewise baseless. In part IV, we consider the Rule 11 issues, concluding that Pelletier and Schlanger prosecuted Pelletier's claims in bad faith. In part V, we address the Rule 38 issues, concluding that Pelletier's appeal is frivolous.

## I.

### A. *Introduction.*

The controversy before us began as a contest over the control of a travel agency in Atlanta, Georgia, Buckhead House of Travel, Inc. (House of Travel). The contest was between Ronald O. Pelletier and C.M. Culpepper. Pelletier, who claimed a 40% ownership in House of Travel's common stock, sought to obtain control over the company's finances and day-to-day affairs from Culpepper, who had founded the company and held 50% of its stock. Pelletier took the contest to the courts, suing Culpepper in both the state and federal courts in Atlanta. When House of Travel went into chapter 11 bankruptcy proceedings, Pelletier sold his interest in the company and dismissed his suits against Culpepper. The sale did not make Pelletier whole; the price he received for his House of Travel interest did not fully compensate him for the price he had paid for it and the cost of his litigation with Culpepper. He thus looked elsewhere for relief, and decided to sue House of Travel's (and, for a time, Culpepper's) lawyer, Gary D. Zweifel, and

---

3. For purposes of convenience, we have consolidated these appeals.

4. Pelletier filed two complaints, an original complaint and an amended complaint. As we discuss *infra,* the district court did not address the merits of the original complaint.

his law firm, Lokey & Bowden. He brought two suits: one in state court against Zweifel and Lokey & Bowden, the other—the instant case against Zweifel alone—in federal court.

Culpepper founded House of Travel in 1970. Soon thereafter he acquired a partner, Leroy Langston, an attorney; each owned 50% of the company's 100 shares of common stock.[5] House of Travel prospered under Culpepper's and Langston's ownership, but their relationship eventually deteriorated. We focus in this appeal on what transpired after Culpepper and Langston decided to part company. First, we describe a stock transaction involving Culpepper, Langston, and William Charles Hurst, Leon Hurst and Pelham Robinson (collectively, the Hurst Group) in which the Hurst Group acquired 80% of Langston's House of Travel shares. Next, we examine the Hurst Group's sale of these shares first to Travel, Incorporated and then (while Travel, Incorporated still owned the shares) to Pelletier. Finally, we focus on Pelletier's sale of the same shares to Elite Travel, Inc. Each of these transactions produced bitter litigation in state and federal court and, ultimately, the case at hand.

### B. *The Culpepper/Langston/Hurst Group Transaction.*

On October 7, 1983, Culpepper and Langston entered into a written stock purchase agreement with the Hurst Group, pursuant to which Culpepper and Langston would each sell the Hurst Group 80% of their House of Travel shares for $32,000. The agreement set a closing date of October 14, 1983.

On October 14, the Hurst Group tendered payment (in the form of cash and a note to be secured by a pledge of the stock it would be receiving from Langston) to Langston; he accepted the payment and transferred 40 of his House of Travel shares to William Charles Hurst, who received the shares and held them in his name for the benefit of the Hurst Group. When the Hurst Group tendered payment to Culpepper, however, Culpepper refused to sell. Culpepper maintained that he and the Hurst Group had secretly agreed that his promise to sell his shares would not be enforced—the promise would be used only to induce Langston to sell his shares.

Culpepper stood his ground, and the Hurst Group decided, for the time being at least, to work with him in the effort to make House of Travel prosper. The two Hursts joined Culpepper on the company's board of directors, which had three members,[6] and agreed that Culpepper would continue to serve as president of the company. William Charles Hurst became the company's vice president and Leon Hurst its secretary and treasurer.[7]

Under House of Travel's bylaws, it took a unanimous vote of the company's directors before the board of directors could act.[8] The Hursts believed that Georgia law precluded the board from changing this requirement[9] and therefore made no attempt to use their numerical advantage on the board to manage the company through the board of directors. As a result, Culpepper used his authority as president to dictate the day-to-day operations of the company. This arrangement, however, did little to enhance House of Travel's profitability. Although the sales volume and dai-

---

5. Langston's wife, Emily, held an interest in his shares. In this opinion, however, we treat Leroy Langston as the sole owner of the shares.

6. House of Travel's bylaws provided: "The number of Directors of the Corporation shall be a minimum of three (3) and a maximum of ten (10), the exact number to be determined from time to time by resolution of the shareholders entitled to vote."

7. Pelham Robinson, the third member of the Hurst Group, became one of the firm's principal salesmen.

8. The bylaws provided that 75% of the directors had to agree for the board to act. There being three directors—Culpepper and the two Hursts—the 75% supermajority requirement could not be met unless all three agreed.

9. The Hursts were mistaken; Georgia law permitted the board of directors of a corporation, by a majority vote of all of the directors, to change a supermajority voting requirement to a simple majority voting requirement. *See* Ga. Code Ann. § 14–2–1022(a)(2) (1989). *See infra* pp. 1481–1482.

ly cash flow steadily increased, the company's operating expenses and need for ready cash increased further. This problem was caused, in part, by the manner in which Culpepper and the Hurst Group dealt with the company's funds; they repeatedly diverted such funds to their own personal use. In addition, Culpepper, as the firm's president, paid himself a handsome salary (given the volume of business he generated) and overpaid his wife and son, who were part-time workers. This practice of using company funds for personal expenditures became a source of strife and, eventually, even criminal accusation: Culpepper accused the members of the Hurst Group of embezzling company funds; they replied in kind.

### C. *The Hurst Group/Travel, Incorporated Transaction.*

By fall of 1984, the Hurst Group wanted out and was actively seeking a buyer for its House of Travel shares. It soon found one—Travel, Incorporated (TI). On November 1, 1984, Wil Brown, TI's president, signed a stock sale and consulting agreement with William Charles Hurst, Leon Hurst, and Pelham Robinson. Brown paid William Charles Hurst $5000 to convey the Hurst Group's shares to TI. William Charles Hurst could not find the Group's stock certificate, so he executed an assignment separate from certificate and promised to give TI any documents that would substantiate his ownership. He further agreed that in the event he found the certificate, he would transfer it to TI immediately. TI also paid Leon Hurst and Robinson $47,500 each for management, promotion, and marketing services they promised to give to TI.

The contract bound the Hurst Group to seek the specific enforcement of its October 7, 1983 stock purchase agreement with Culpepper, wherein he promised to sell the Hurst Group 40 of his House of Travel

shares. If the Hurst Group succeeded in acquiring these shares from Culpepper, it would transfer them to TI for the price it paid Culpepper, thus making TI the owner of 80% of House of Travel's stock.[10] The Hurst Group and TI did not want Culpepper to know of their agreement, and the Hurst Group acted accordingly; it did nothing that would indicate to Culpepper that it had sold its stock. In fact, it took steps to gain control of the company. On November 9, 1984, the Hurst Group, carrying out its contractual obligation to TI, brought suit against Culpepper in the Superior Court of Fulton County, Georgia, seeking the specific performance of its October 7, 1983 agreement with Culpepper.[11]

When TI purchased the Hurst Group's stock, it insisted on the right to rescind the purchase at its sole and unfettered discretion. Accordingly, its agreement with the Hurst Group contained the following condition subsequent: TI could rescind the agreement within 180 days if it determined, in its discretion, that it would not be able to acquire Culpepper's shares either directly from him or through the Hurst Group's suit for specific performance of the October 7, 1983 contract. TI simply would give Leon Hurst and Robinson written notice of its decision to rescind and tender an assignment of the shares. Leon Hurst and Robinson executed a promissory note that would obligate them to pay TI $95,000 if TI rescinded, and Leon Hurst secured the note by deeding TI a tract of land in Spalding County, Georgia.[12] William Charles Hurst executed a separate $5000 promissory note that was payable upon rescission and secured by a pledge of the House of Travel shares TI would return to the Hurst Group, or their proceeds. On December 1, 1984, a month after TI bought the stock, Wil Brown purportedly told one of the Hursts that TI was rescinding the transaction. Thereafter, the Hurst Group, apparently

---

**10.** Of the remaining 20% of House of Travel's stock, Culpepper and Langston would each own 10%.

**11.** As we point out *infra,* that suit was still pending on December 29, 1984, when Pelletier

purported to purchase from the Hurst Group the shares it had sold to TI.

**12.** Leon Hurst had Hurst Building & Development Company deed TI some Pike County, Georgia property as additional security.

believing that this oral communication had operated to rescind its sale to TI,[13] began looking for a buyer of the shares it had sold to TI.

### D. The Pelletier/Hurst Group Transaction.

1. Pelletier Negotiates to Obtain the Hurst Group's Stock and Culpepper's Control of House of Travel.

In early December 1984, Pelletier heard from Culpepper and others that House of Travel was in serious financial trouble and that the Hurst Group wanted to sell its interest in the company. (Culpepper did not know that the Hurst Group had sold its shares to TI.) Pelletier, who owned a local travel agency, Travel Agency Group, believed that House of Travel, which still enjoyed an excellent reputation in the Atlanta area, had great potential and would be a good investment.[14]

Pelletier promptly contacted the Hurst Group and found that it was willing to sell its shares. He did not want to acquire a minority interest in the company (the Hurst Group ostensibly held 40%, and Culpepper 50%, of House of Travel's shares), however, unless he could also acquire from Culpepper the power to manage the company's finances and day-to-day operations—powers that Culpepper possessed as House of Travel's president. He therefore asked Culpepper whether Culpepper would be willing to transfer such powers to him if Pelletier bought the Hurst Group's shares and obtained additional capital for the company. Pelletier thought that Culpepper would agree to do this because Culpepper had said that he was fed up with the Hurst Group's practice of using company funds to pay their personal obligations and wanted

them out.[15] Pelletier also asked Culpepper whether he would agree to a neutral board of three directors, consisting of Pelletier, Culpepper, and an independent third party chosen by them.[16] (Apparently, Pelletier, unlike the Hursts, did not believe that the affirmative vote of all three directors was necessary for the board to act. He later changed his mind, though, concluding that to neutralize Culpepper's vote the board of directors would have to be increased to four. See infra p. 1478.)

Culpepper indicated a willingness to do these things, and Pelletier said that he would have his attorney draw up a management agreement, reducing their understanding to writing. Following his discussion with Culpepper, Pelletier gave his notes of the discussion to Frank M. Conner III, an associate with the Alston & Bird law firm in Atlanta, and instructed Conner to draft a written agreement that would accomplish his objective.

2. Pelletier Buys the Hurst Group's Stock.

On December 29, Pelletier acquired the Hurst Group's interest in House of Travel, pursuant to a stock purchase agreement Conner drafted and the parties signed that day. The agreement recited that, upon its execution, Pelletier became the owner of the Hurst Group's House of Travel stock. In payment for the stock, Pelletier gave the Hurst Group $10,000 in cash, a check for $82,600, which the Hurst Group was to hold "in escrow" until January 15, 1985, and a promissory note in the sum of $50,000, payable on January 15, 1986. Pelletier, in turn, received the following: an affidavit executed by William Charles Hurst

---

13. The promissory notes executed by the Hursts and Robinson, guaranteeing repayment of the purchase price if TI rescinded, were payable on demand. TI made no demand for payment until it rescinded the agreement in writing in March 1985.

14. In addition, Pelletier believed that if he could acquire a principal interest in House of Travel, he would merge his travel agency with it.

15. During this conversation, Culpepper told Pelletier that the Hurst Group had misappropriated

company funds by using the company's expense accounts to pay for personal expenses and that he and Zweifel, House of Travel's attorney, were threatening to put the members of the Hurst Group "in jail for these indiscretions." Pelletier told Culpepper that the Hurst Group was accusing Culpepper of the same thing.

16. Pelletier suggested that, if he and Culpepper could not agree, they would have Arthur Anderson & Co. pick the third director.

(in whose name the stock certificate for the Hurst Group's shares had been held) stating that House of Travel should issue a new stock certificate to Pelletier to indicate his acquisition of the Hurst Group's interest in the company;[17] the resignations of the two Hursts from their positions as officers and directors of House of Travel; and the Hurst Group's promise to use its best efforts to obtain releases for House of Travel from certain debts. It was agreed that Pelletier would not deliver the Hursts' resignations to the company, and the resignations would remain secret, until Pelletier had entered into a written management agreement with Culpepper.

Finally, in a subsidiary agreement, which, for obvious reasons, was not to be disclosed to Culpepper, the Hurst Group agreed to use its best efforts in pursuing its state court claim against Culpepper for the specific performance of their October 7, 1983 stock purchase agreement, and to allow Pelletier to select the lawyer to represent the Hurst Group in prosecuting the case. If, in that case, the Hurst Group obtained a decree requiring Culpepper to tender his House of Travel shares to the Hurst Group, then Pelletier would purchase these shares from the Hurst Group for $1000.[18]

Pelletier wanted the subsidiary agreement as a means of protection; he did not trust Culpepper and, as he later testified when deposed in this case, he "might [have been] foolish [to] think[ ] that it was going to be so easy to get Culpepper to agree to what he already agreed to; in other words, to get it on paper." Thus, by gaining control over the Hurst Group's prosecution of its suit against Culpepper and, if the suit was successful, an additional 40% of House of Travel's outstanding shares, Pelletier minimized the negative consequences of Culpepper's refusal to agree "on paper."

### 3. Pelletier Fails to Gain Control.

With the stock purchase agreement and the secret subsidiary agreement in hand, Pelletier and Conner met with Culpepper on January 8, 1985, at Conner's law office, to discuss the management agreement Conner had drafted at Pelletier's request. Zweifel, whose law firm, Lokey & Bowden, represented House of Travel, attended the meeting to advise Culpepper whether the agreement Pelletier would be presenting would serve House of Travel's best interests and, further, would be consistent with the company's charter and bylaws. Pelletier had never met, or even heard of, Zweifel and thought that Zweifel was there to represent Culpepper. We accept Pelletier's interpretation of Zweifel's role for purposes of deciding this appeal: at the meeting, Zweifel acted as counsel for both Culpepper and House of Travel.

Zweifel arrived at Conner's office ahead of Culpepper and Pelletier, and Conner handed him a draft of the agreement Pelletier had asked him to prepare. Zweifel read the draft and told Conner (before Culpepper and Pelletier appeared) that Culpepper would never sign the agreement. For one thing, the draft provided no consideration flowing from Pelletier either directly or indirectly (through House of Travel) to Culpepper.

---

**17.** Apparently, Hurst had not found his certificate and thus could not simply transfer it to Pelletier.

**18.** Inexplicably, the subsidiary agreement did not require Pelletier to reimburse the Hurst Group for the price, $32,000, that it would have to pay Culpepper for the shares if it won the suit. The relevant language of the subsidiary agreement provided as follows:

The parties agree that if [the Hurst Group's] request for specific performance of the agreement is granted by any court with the result that Mr. Culpepper is required to transfer the record ownership of the Shares and any other shares of common stock of [House of] Travel

to [the Hurst Group], [the Hurst Group] shall immediately sell, convey and transfer the Shares and any other shares of common stock of [House of] Travel owned by [the Hurst Group] to Pelletier in exchange for a payment by Pelletier in the form of a certified check to Plaintiffs in the amount of One Thousand Dollars ($1,000).

Thus, according to the plain language of the agreement, the Hurst Group bound itself to make a $31,000 gift to Pelletier if it won the suit (assuming that the possibility of recovering the stock had not been factored into the price Pelletier paid for the shares).

Conner's draft, in its preamble, stated that Pelletier was "in the process of consummating the acquisition of [the Hurst Group's] stock," but that "[p]rior to consummating the acquisition of the [Hurst Group's stock], it [was] necessary for Pelletier to enter into an agreement with Culpepper," i.e., the agreement Conner had drafted. This quoted language indicated, falsely, that Pelletier had not yet purchased the Hurst Group's stock; actually, as we have noted, Pelletier had bought the stock ten days earlier, on December 29, 1984, pursuant to the stock purchase agreement Conner, himself, had prepared.[19]

As soon as Pelletier and Culpepper arrived at Conner's office, Pelletier made his presentation. He predicted an optimistic future for House of Travel if Culpepper signed the management agreement Conner had drafted and if Pelletier's purchase of the Hurst Group's stock went through. Pelletier knew, of course, that he had already bought that stock,[20] but he wanted Culpepper, and Zweifel, to believe that his deal with the Hurst Group was still in the negotiation stage.[21] After Pelletier finished his presentation, he summarized the management agreement Conner had prepared. Zweifel then commented on the document. He said, quite bluntly, that the

**19.** When asked on deposition, during the discovery in this case, how he could reconcile this quoted language with the language of his December 29 stock purchase agreement with the Hurst Group, which stated that, upon execution of that agreement, Pelletier acquired the Hurst Group's stock, Conner offered the following explanation:

Q. In drafting [the January 8 agreement between Pelletier and Culpepper], was it your intent to leave the impression in the mind of the reader that the [December 29] Stock Purchase Agreement [with the Hurst Group] was not yet complete?

A. There was no intent with respect to this particular language other than two thoughts that I had. And the first was an effort on my part to characterize the overall transaction contemplated by the Stock Purchase Agreement in a manner that was consistent with how we perceived it and how it actually came about. And what I mean by that is it was clear in [Pelletier's] mind *that it was a condition precedent to entering into the Stock Purchase Agreement that he reach or come to an agreement with Mr. Culpepper as to how the company would be managed after the actual stock purchase.*

. . . .

The second thought behind it is if you review the Stock Purchase Agreement, it's very evident that we contemplated a number of different transactions occurring, certainly more than just the purchase of 40 shares of common stock. If you look at how we structured the payment of the purchase price, as we discussed before, you had only $10,000 being paid on December 29, the vast majority of the purchase price being put into an escrow until January 15th, and the note being due and payable on January 15, 1986.

It is clear from my memory *that we were trying to create an informal escrow arrangement that we contemplated certain events occurring, primarily the entering into the written Agreement with Mr. Culpepper.*

If you look at the facts surrounding the actual stock purchase on December 29th, it is clear that we were not a stockholder of record. We did not even have a stock certificate in hand . . . . So all of this is to say that *we saw or perceived the transaction from a substantive perspective as being one large transaction with a number of different elements, that it was a fluid transaction, that it would occur over a period of time.* And that was the intent behind the language.

. . . .

Q. *Isn't it true that you didn't want Mr. Culpepper to be in a position where he knew that Mr. Pelletier had acquired nearly a 40 percent interest in the company and had no way to back out of that, no options, no recourse?*

A. *We would have preferred that he not know that. . . .*

(Emphasis added.)

**20.** Pelletier testified that, in his mind, he acquired the Hurst Group's stock on December 29, 1984. Had he tried later to rescind the deal, he would have expected the Hurst Group to sue him.

**21.** Pelletier confirmed this in testimony he gave in the state court suit he subsequently brought against Zweifel and the Lokey & Bowden law firm for allegedly breaching their professional duties to him as House of Travel's counsel. *See infra* p. 1487. As the Georgia Court of Appeals wrote, in dismissing Pelletier's claims against these attorneys, "[Pelletier] testified that [in making his presentation to Culpepper, and Zweifel, at Conner's law office, on January 8, 1985,] he wished Culpepper to believe that he had not yet consummated the transaction with the Hurst Group but to believe that he was still negotiating with that group of shareholders as well as Culpepper." *Lokey & Bowden v. Pelletier,* 192 Ga.App. 470, 385 S.E.2d 90, 91 (1989).

proposed agreement was "not what [House of] Travel needed." At this point, Culpepper said that he wanted to confer privately with Zweifel, and they withdrew to another room. There, Zweifel advised Culpepper not to sign the document, explaining that the agreement was one-sided: Pelletier would not be obligated to do anything for Culpepper or the company.[22] Culpepper decided to follow Zweifel's advice, and they returned to Conner's office and informed Pelletier and Conner that their negotiations had ended. At this point, Pelletier abandoned his efforts to get a management agreement from Culpepper; to accomplish his objective, the managerial control of the company, Pelletier would use the courts—in particular, the courts' power to issue injunctions and temporary restraining orders.

4. Pelletier Goes to Court to Gain Control.

On January 9, the day after Culpepper refused to sign the contract Conner had prepared, Pelletier wrote Peter Q. Bassett, one of the partners in Conner's law firm who specialized in litigation. Attached to Pelletier's letter were a series of exhibits, including Pelletier's December 29, 1984 stock purchase agreement with the Hurst Group and a statement entitled: "Facts Regarding Buckhead House of Travel." The letter and the exhibits, collectively, informed Bassett that Pelletier had purchased the Hurst Group's House of Travel stock on December 29, 1984; that Culpepper had induced Pelletier to purchase the stock by telling Pelletier that, if Pelletier

bought the Hurst Group's stock, he would be willing to give him control over the financial affairs of the company and its day-to-day operations; that Pelletier had Conner prepare a formal agreement to this effect; and that when Conner presented the agreement to Culpepper on January 8, 1985, Culpepper refused to sign it. The letter and exhibits also informed Bassett of the suit the Hurst Group had brought against Culpepper in state court, seeking the specific performance of Culpepper's contractual obligation to sell it 40 of his House of Travel shares, and that the Hurst Group had given Pelletier the right to control the prosecution of that suit with a lawyer of his choice.

In his letter, Pelletier instructed Bassett "to proceed in this matter as aggressively and expeditiously as possible," and "to consider the following courses of action." First, Pelletier instructed Bassett to consider instituting a judicial proceeding to have "a receiver immediately appointed" to take over House of Travel's operations. Alternatively, Bassett was to consider asking the court to "appoint a Provisional Director" for the company. This would give the company four directors—Culpepper, Charles and Leon Hurst, whose resignations Pelletier told Bassett to "sit on" so that they could continue to function as Pelletier's nominees, and the provisional director, who presumably would side with the Hursts, thus giving Pelletier the 75% vote he thought House of Travel's bylaws required before the board of directors could act.[23] Second, Pelletier instructed

---

**22.** Zweifel's advice was imminently sound. When Conner handed him a draft of the proposed agreement, Zweifel recognized that it failed to address several important facets of a binding agreement. First, Pelletier had not spelled out his financial commitment to House of Travel. If Culpepper desired anything from his negotiations with Pelletier, it was to come to an understanding on Pelletier's acquisition of working capital for the company. Yet the draft agreement contained no commitments for cash or credit—Pelletier only agreed to become a shareholder in House of Travel by purchasing a third party's stock. Certainly Culpepper would demand more consideration flowing to him in exchange for surrendering his authority at House of Travel. Second, Zweifel must have

recognized that the agreement failed to provide for the dismissal of the Hurst Group's specific performance suit against Culpepper. Although at the time Pelletier was concealing his control of this litigation, Zweifel, acting in Culpepper's, and the company's, best interest, would have attempted to bring the Hurst Group into the negotiations and compromise their claims before permitting Culpepper to sign anything with Pelletier. With these defects in the agreement presented to Culpepper, Zweifel would have been remiss in advising Culpepper that it was acceptable.

**23.** Pelletier, the Hurst Group, and their attorneys all believed that the deadlock in the existing board of directors (Culpepper and the

Bassett to consider bringing on behalf of Langston, not Pelletier, a shareholders' derivative action against Culpepper "on grounds of misfeasance and R.I.C.O. (if we can substantiate any criminal acts)." Third, Pelletier instructed Bassett to "[c]ommence depositions immediately" in the Hurst Group's suit against Culpepper for specific performance. In giving Bassett this instruction, Pelletier was apparently exercising the right the Hurst Group had given him in the December 29 subsidiary agreement to control the prosecution of that suit.

Fourth, and finally, Pelletier instructed Bassett, "as economic pressure," to "have several of [House of Travel's] corporate lenders place [it] in default." Pelletier thought that this might cause Culpepper to accede to his demands. Pelletier added that making Culpepper "deal with [the Hursts and Robinson] is probably the greatest pressure we can place on Culpepper. Economic pressures would come a close second."

On the same day, January 9, that Pelletier was instructing Bassett on how to proceed against Culpepper, Conner was communicating with Zweifel by telephone. Conner called Zweifel to inform him that Pelletier had purchased the Hurst Group's interest in House of Travel.[24] He took Zweifel by surprise; Zweifel thought that Culpepper's refusal to sign the management agreement Conner had presented to him on January 8 had caused Pelletier to abandon his plan to purchase the Hurst Group's stock.

After informing Zweifel that Pelletier had acquired the Hurst Group's interest, Conner asked Zweifel to issue Pelletier a stock certificate for his 40 shares. Conner told Zweifel that he did not have the Hurst Group's stock certificate; William Charles Hurst had lost it. Conner said that Hurst had given him an affidavit, stating that he had lost the certificate, and asked Zweifel whether he would honor the affidavit and issue Pelletier a certificate. Zweifel said that he would if Conner would write him a letter confirming that this stock transaction had taken place and enclosing Hurst's affidavit. Conner wrote Zweifel the next day, January 10, as requested.

A day or so after Zweifel received Conner's letter and Hurst's affidavit, he prepared a new certificate in Pelletier's name and asked Leon Hurst, House of Travel's secretary, to sign it. Leon Hurst told Zweifel to mail the certificate to his attorney, Brant Jackson, and stated that he would sign the certificate at Jackson's office and deliver it to Pelletier. On January 15, Zweifel drafted a letter to Jackson, stating that he was forwarding a House of Travel stock certificate to him at Leon Hurst's request, but the next day, before Zweifel could mail the letter, Bassett called him to say that he had just filed suit (which the parties, and therefore we, refer to as the shareholders' derivative suit) in the Superior Court of Fulton County, Georgia, against House of Travel, Culpepper, and the two Hursts. The plaintiffs, Bassett said, were Pelletier and Langston.

Hursts) was irresoluble without court action. As we note above, *see supra* note 8, the company's bylaws provided that the board could act only with a 75% majority. Because the board consisted of only three directors, it could act only with a unanimous vote, which appeared unlikely given the antagonistic relations between Culpepper and the Hursts. The shareholders could increase or decrease the number of directors, but could do so only with a majority vote—again unlikely given the alignment of Langston (10% of the shares) with the Hurst Group (40% of the shares). Any vote of the shareholders to increase or decrease the number of directors almost certainly would result in a tie. Finally, with Culpepper owning 50 of the 100 outstanding shares, the Hurst Group owning 40 shares, and Langston owning 10 shares,

no matter which way Langston voted his shares, no faction could elect more than two of the three directors. The bylaws provided that each share was entitled to one vote in an election of directors, and the Georgia Code provided that voting would be noncumulative (i.e., the top three vote-getters would win), *see* Ga.Code Ann. § 14-2-728 (1989). Therefore, no faction could elect all three directors unless it controlled at least 76 shares. Consequently, Pelletier, and subsequently Bassett, believed that the only solution to the deadlock was a court-appointed fourth director who would vote with the Hursts.

**24.** The record does not reveal whether Conner informed Zweifel of the date on which Pelletier had purchased the Hurst Group's interest.

Bassett's complaint contained six claims for relief. Three of these were claims Pelletier had instructed Bassett to pursue: count one of the complaint requested, on behalf of both plaintiffs, the appointment of a receiver pursuant to Ga.Code Ann. § 9–8–1 (1982);[25] count two requested, again on behalf of both plaintiffs, the appointment of a provisional director pursuant to Ga.Code Ann. §§ 14–2–940, –941 (1989);[26] and count three, a shareholders' derivative claim brought only by Langston, sought money damages against Culpepper for violations of the Georgia RICO statutes, Ga.Code Ann. §§ 16–14–1 to –15 (1988). Of the remaining counts, which were lodged against Culpepper alone, one count sought money damages for both plaintiffs on the ground that Culpepper had breached "fiduciary duties and other duties owed by Culpepper as shareholder and President, to Plaintiffs." The second count sought money damages for Pelletier for Culpepper's breach of an oral promise he had made to Pelletier, prior to Pelletier's December 29, 1984 acquisition of the Hurst Group's House of Travel stock, to transfer to Pelletier "complete financial control" of House of Travel and "supervisory responsibility" over its employees. The third count sought money damages for Pelletier on the ground that Culpepper never intended to perform the oral promise referred to in the preceding count and thereby fraudulently induced Pelletier to purchase the Hurst Group's stock.

In addition to the relief described above, Bassett's complaint asked for a temporary restraining order against Culpepper, requiring that Culpepper maintain the status quo in House of Travel's day-to-day operations and that he make the company's books and records available for inspection by the company's officers, directors, and shareholders. The complaint also prayed that the court convert the temporary restraining order into a preliminary and, then, a permanent injunction.

Meanwhile, Pelletier apparently had second thoughts on who should prosecute the Hurst Group's specific performance action against Culpepper—Bassett or another attorney. Pelletier decided that a different attorney should handle that case, and on January 13, 1985, he contacted Herbert P. Schlanger. Pelletier told Schlanger about the case and that the Hurst Group, by contract, had given him the right to prosecute its claim against Culpepper with an attorney of his choice. Pelletier wanted Schlanger to handle the prosecution of the case. He explained that the Hurst Group would remain in the case as the party plaintiff, but only as his, Pelletier's, nominee—Pelletier, not the Hurst Group, would be Schlanger's client and would pay all of Schlanger's fees and expenses. Schlanger accepted the assignment.

The next day, Pelletier contacted Schlanger again, to tell him that Bassett would soon (on January 16) be filing a shareholders' derivative suit against Culpepper and House of Travel and that William and Leon Hurst would be named as co-defendants in the case. Pelletier explained that he and Langston were bringing the suit; he also explained that they would be seeking no relief of any kind against the Hursts.[27] Rather, Culpepper was their target; by

---

**25.** Ga.Code Ann. § 9–8–1 states, in pertinent part: "When any fund or property is in litigation and the rights of either or both parties cannot otherwise be fully protected or when there is a fund or property having no one to manage it, a receiver of the same may be appointed...."

**26.** Ga.Code Ann. §§ 14–2–940(a)(2), –941(a)(7) provide that the court may appoint a provisional director when a corporation's board of directors is deadlocked, the shareholders cannot break the deadlock, and the corporation is suffering irreparable harm from the deadlock.

**27.** Given that the complaint Bassett filed sought no relief against the Hursts, he, and Schlanger,

were asked—when deposed in the instant case— what reason there was to sue them. Bassett and Schlanger testified that they believed that the Hursts, as House of Travel directors, had to be named as parties defendant in order for Pelletier and Langston to obtain relief (on behalf of House of Travel) on their shareholders' derivative claim against Culpepper. We find no basis for such belief in the Georgia code or case law; see Ga.Code Ann. §§ 14–2–740 to –747 (1989); Smyly v. Smith, 216 Ga. 529, 118 S.E.2d 188, 189 (1961) (holding that company must be named as defendant, but not mentioning directors), or, for that matter, in jurisprudence anywhere.

having the Hursts in the case as cooperating parties defendant, they could bring more pressure on Culpepper. Pelletier asked Schlanger if he would file an appearance in the case as counsel for the Hursts and, at the same time, represent his, Pelletier's, interests in the matter. Schlanger said that he would take on this additional assignment, and for the next three and a half months, i.e., until the prosecution of the suit was stayed automatically by House of Travel's commencement of chapter 11 proceedings in the bankruptcy court, Schlanger, while ostensibly representing the Hursts, followed Pelletier's instructions and represented his interests. As Pelletier later testified on deposition in the instant case, he paid all of the fees Schlanger charged and the expenses he incurred in representing the Hursts; he and Schlanger maintained the same attorney-client relationship during the prosecution of the shareholders' derivative suit against Culpepper that they maintained during the prosecution of the Hurst Group's suit against Culpepper. In short, according to Pelletier, the Hursts were to take "whatever steps were necessary" to accomplish his objectives.

Following his conversation with Pelletier, and before Bassett filed his suit, Schlanger decided that it "might be a good tactical move" for Pelletier if the Hurst Group sued Culpepper in federal court for securities fraud.[28] He discussed the idea with Pelletier and one of the Hursts, and they agreed that Schlanger should file the suit. Proceeding with great haste, Schlanger drafted a complaint and showed it to Bassett—"to ensure that [he] was not misstating the facts as [they] knew them at the time." Bassett found no misstatements, and, on January 16, the same day Bassett brought the shareholders' derivative action in state court, Schlanger filed suit in the federal district court in Atlanta: he named the Hurst Group as plaintiff and Culpepper as defendant. Schlanger also moved the district court to issue a temporary restraining order—an order that contained the same provisions as the temporary restraining order Bassett was simultaneously requesting the state court to issue.

Schlanger based his complaint, which was framed in one count, on the same transaction that gave rise to the Hurst Group's specific performance action against Culpepper, i.e., the Hurst Group's October 7, 1983 contract with Culpepper and Langston for the purchase of 80% of House of Travel's shares of common stock. Schlanger did not, however, seek Culpepper's performance of that contract; rather, he sought the recovery of money damages under 15 U.S.C. §§ 77$l$(1), (2), 77q(a), and 78j(b) (1988) and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1990).[29] Schlanger alleged, in his complaint, that Culpepper, at the time he entered into the agreement, fraudulently misrepresented that he intended to discharge the obligations he was assuming and thereby induced the Hurst Group to purchase Langston's House of Travel shares. Schlanger alleged that Culpepper's conduct violated the federal securities laws and rendered him answerable to the Hurst Group for money damages under those laws.

The complaints in Bassett's and Schlanger's suits were filed at about the same time on January 16, around 9:00 a.m.; by 9:15 a.m., Bassett had the temporary restraining order he had prayed for in his complaint. At this point Bassett called Zweifel to say that he had just sued House of Travel, Culpepper, and the Hursts in state court and had obtained a temporary restraining order, which, among other things, prevented Culpepper from altering or removing House of Travel business doc-

---

**28.** Schlanger, in testifying on deposition in the instant case, did not explain how this move would benefit Pelletier or the Hurst Group, nor was he asked. Whatever his tactical reasons for filing the suit, Schlanger apparently abandoned them; he failed to prosecute the case.

**29.** The complaint recited that the case also "involve[d] pendent claims under state law with respect to the sales of securities, misrepresentations, fraud and contracts." It contained no additional counts, however, beyond the one brought under the federal securities laws cited in the text *supra*. Had Schlanger intended to bring additional claims under state law, we assume that he would have brought them in separate counts, as required by Fed.R.Civ.P. 10(b).

uments or selling or encumbering its assets except in the ordinary course of business. During the conversation, he and Zweifel discussed the possibility of substituting a consent decree for the temporary restraining order and decided to meet later in the day to explore the possibility further.

They met shortly before noon; Schlanger and Culpepper joined them. The meeting, which went until late in the afternoon, resulted in a consent decree, incorporating the provisions of the temporary restraining order and describing the House of Travel records Culpepper was to produce and how he was to produce them. In exchange for the consent decree, Schlanger agreed not to pursue his request for a temporary restraining order in the federal district court, and he informed the district court that he no longer needed the order. (According to the clerk's docket sheet for the case, Schlanger told the court that the case had been settled. When, thereafter, he failed promptly to dismiss the case, the court dismissed it sua sponte without prejudice.)

As soon as the meeting ended, the attorneys submitted the consent decree, which had been signed by Bassett (on behalf of Pelletier and Langston), Schlanger (on behalf of the Hursts), Zweifel (on behalf of House of Travel), and Culpepper, to the superior court judge who had issued the temporary restraining order. The judge approved the decree, and it took effect that day.

The next morning, January 17, Schlanger, Pelletier, Leon Hurst, and Pelham Robinson appeared at House of Travel's office to examine the company's records. After a brief conversation with Culpepper and Zweifel, they began their examination. Schlanger asked to see the company's accounts receivable and several other documents, many of which would reveal the identity of most of House of Travel's clients, and Zweifel objected. Pelletier owned a competing travel agency, and Zweifel believed that to permit Pelletier access to these documents would be to disclose House of Travel's "trade secrets," something he was not prepared to do. Schlanger announced that he would have

the superior court settle the matter, and later in the day, he, Bassett, Zweifel, and Hamilton Lokey and Gerald Handley (partners of Zweifel's) appeared before the judge who had signed the consent decree. After hearing from counsel, the judge concluded that Culpepper and House of Travel had not been complying with the consent decree and directed them to obey it. The judge, however, understood Zweifel's concern that Pelletier not obtain the identity of House of Travel's clients, and, in the handwritten order he issued following the hearing, he provided that the names of the clients be redacted from the company's records before the records were produced for examination. The following morning, the examination of the records continued without further dispute.

The next significant events took place on January 25. First, Bassett amended the complaint in the shareholders' derivative suit to add a count seeking the liquidation of House of Travel pursuant to Ga.Code Ann. § 14–2–1430 (1989). Bassett alleged that the company's three directors were hopelessly deadlocked, i.e., neither faction on the board, Culpepper or the two Hursts, was able to muster the 75% affirmative vote the company's bylaws required for the directors to act; that the appointment of a provisional director, pursuant to Ga.Code Ann. § 14–2–941, would not alleviate the situation; that House of Travel's management, i.e., Culpepper, was wasting the company's assets; and that unless the company were liquidated, its shareholders would lose what equity they still had in the company. Bassett requested the appointment of a receiver to accomplish the liquidation.

Second, Schlanger, having appeared as counsel for the Hurst Group in its specific performance action against Culpepper, noticed Culpepper's deposition in that case for February 4, 1985. Schlanger used the Hurst Group's right to depose Culpepper in that case as a means of interrogating him in the two suits that had been brought on January 16—the state court shareholders' derivative suit and the federal court securi-

ties fraud suit.[30] (Both the Georgia and federal procedural rules, which dictated when the deposition of a defendant could be taken, prohibited the taking of Culpepper's deposition in those two cases for thirty days from the date, January 16, the complaints were filed unless leave of court were obtained.[31] By using the specific performance action as the vehicle for noticing Culpepper's deposition, Schlanger was able to circumvent these prohibitions.)

Third, Zweifel, as House of Travel's counsel, responded to Pelletier's demand that Zweifel issue him a stock certificate for the House of Travel shares he had purchased from the Hurst Group on December 29, 1984. Zweifel did so by writing Pelletier, in care of his attorney, Bassett, and, also, William Charles Hurst, in care of his attorney, Schlanger. The two letters were identical, and advised Pelletier and Hurst that a new certificate would not issue for the following reasons: (1) the allegations of the complaints in the Hurst Group's state and federal court suits against Culpepper for specific performance and for securities fraud, respectively, raised the question whether the Hurst Group actually owned any House of Travel stock, i.e., whether Culpepper's allegedly fraudulent conduct on October 7, 1983, had, in effect, vitiated the Hurst Group's purchase of Langston's shares in the company; (2) assuming that it acquired the stock, the Hurst Group had pledged the stock to Langston as security for a $26,000 promissory note, and, according to House of Travel's corporate minute book, the pledge was still in effect—Zweifel advised that until Langston assured him that the stock had been released from the pledge, he could not issue a new certificate; (3) before a new certificate could issue, William Charles Hurst would have to produce his stock certificate or, in lieu thereof, as required by Ga.Code Ann. § 11-8-405(2)(b) (1982), a bond, issued by a commercial surety, in the amount of $150,000—approximately the price Pelletier paid the Hurst Group for its shares—indemnifying House of Travel for any damages it might sustain for wrongfully issuing a certificate to Pelletier; (4) the Hurst Group's certificate contained a legend which indicated that the shares represented by the certificate could not be sold or transferred unless a registration statement was filed as prescribed by federal law or the sale or transfer was exempt from registration under both federal and state law. Zweifel advised that he would not issue Pelletier a certificate unless the Hurst Group and Pelletier demonstrated that a registration statement had been filed or that the sale was exempt from registration.

The same day, January 25, Zweifel sent Schlanger copies of the letters he had written to Pelletier and William Charles Hurst. In the cover letter accompanying the copies, he told Schlanger that, given the uncertainty as to who owned the 40 shares at issue—Langston, the Hurst Group, or Pelletier[32]—he would not permit Pelletier or the Hursts to examine any of House of Travel's records. Zweifel added that if Schlanger insisted on such examination, he would seek direction from the superior

---

**30.** In his deposition in the instant case, Schlanger testified that

> [i]t was obvious that we could not get access to any information in the [shareholders' derivative suit], ... and there was available another piece of pending litigation in which discovery could be taken. And I am certain that at some time during this period of time we did decide to attempt to get some discovery through the [specific performance] litigation.

**31.** The federal and Georgia rules, which are identical, provide that a plaintiff may not take a defendant's deposition within thirty days of filing the complaint and serving the summons, unless leave of court is obtained. *See* Fed.R. Civ.P. 30(a); Ga.Code Ann. § 9–11–30(a) (1982).

Although the two rules are written in terms of preventing a plaintiff from taking a deposition within thirty days of filing, the rules are designed to protect defendants, *see* Fed.R.Civ.P. 30 advisory committee's note, and certainly would apply to adversarial codefendants (the Hursts in Pelletier's shareholders' derivative suit against Culpepper) who wish to take another defendant's (Culpepper's) deposition.

**32.** At this point, Zweifel did not know that the Hurst Group had sold its House of Travel shares to TI on November 1, 1984, and that TI owned the shares when Pelletier purported to buy them from the Hurst Group on December 29, 1984. *See infra* p. 1494.

court in the form of a clarification of the consent decree the court had signed; he indicated that he was willing to appear before the court at Schlanger's convenience. Schlanger promptly moved the superior court to hold House of Travel and Culpepper in contempt, for refusing to comply with the consent decree, and requested an emergency hearing on the matter. The hearing was never held.

Sometime between January 25—when he amended the complaint in the shareholders' derivative suit to seek the appointment of a receiver and the liquidation of House of Travel—and February 4, Bassett discovered that he had erred in concluding that a simple majority of House of Travel's three directors could not amend the company's bylaw that required 75% of the directors to agree before the board of directors could act. Bassett had overlooked the Georgia statute that gave a simple majority of a corporation's directors the power to amend a company bylaw that imposed a supermajority voting requirement for board action. *See* Ga.Code Ann. § 14–2–1022(a)(2) and *supra* note 9. Given this statute, Bassett concluded that the two Hursts could override Culpepper's negative vote and change House of Travel's bylaws to provide that a simple majority of directors could exercise the board's powers. In short, the Hursts could strip Culpepper of his president's role, manage the company for Pelletier, and possibly make the liquidation of the company unnecessary. Bassett promptly shared his discovery with Schlanger, and they agreed that the Hursts, speaking through Schlanger, would immediately call a special meeting of House of Travel's board of directors.[33]

On February 4, Schlanger, acting for the Hursts (and, through them, Pelletier), wrote Culpepper's and House of Travel's attorneys—Nicholas P. Chilivis, whom Culpepper had recently retained, and Zweifel— and requested that Culpepper, as company president, schedule a special meeting of the board at a time no later than February 11 for the purposes of, among other things, (1)

amending the company's bylaws to change the 75% supermajority voting requirement to a simple majority voting requirement; (2) discharging the company's officers and appointing new officers; and (3) discharging the company's counsel (Lokey & Bowden), and retaining new counsel. A day or two later, Schlanger, Chilivis, and Zweifel agreed that a special meeting would take place on February 8, instead of February 11, but it was postponed to enable Pelletier and Culpepper, and their attorneys, to discuss the possibility of a settlement. They were unable to reach a settlement, and on February 11 Schlanger wrote Chilivis and Zweifel again, asking them to reschedule the board meeting for a time no later than February 15. Gerald Handley, a Lokey & Bowden partner who had been assisting Zweifel in the House of Travel matters, responded: he told Schlanger that a settlement was still possible and asked for more time. Schlanger declined to give it and, moreover, treated Handley's response as a refusal by Culpepper to reschedule the board meeting. The company's bylaws provided that, if the president refused to call a special meeting when requested by a director, any two directors could do so. On February 12, drawing on this provision, the Hursts, acting through Schlanger, noticed a special meeting for 3:00 p.m. on February 15 at the Lokey & Bowden law office.

The meeting took place as scheduled, but it lasted only a few minutes. Schlanger, who came with the Hursts, wanted the meeting recorded, so he brought a court reporter. Zweifel, who was there with Culpepper, objected to the court reporter's and Schlanger's presence. When the reporter and Schlanger left the room, the meeting began. Leon Hurst moved that paragraph 3.10 of the bylaws—the 75% supermajority provision—be amended to permit the board to act on a simple majority vote. William Charles Hurst seconded the motion, and it passed, Culpepper voting no. According to some corporate minutes Schlanger later

---

**33.** The bylaws provided for two types of directors' meetings: regular annual meetings that occurred, without notice, immediately following the annual shareholders' meetings, and special meetings called at any other time with three days' notice.

prepared (based on what the Hursts told him), Leon Hurst then moved that the meeting be "adjourned" in accordance with "paragraph 3.13 of the bylaws ... until 4:30 p.m. at the offices of Herbert P. Schlanger." The motion carried (on the Hursts' vote), and the meeting adjourned. At this point, Schlanger returned to the room and stated that the meeting would continue at his office with or without Culpepper and Zweifel and that the court reporter would be present to record the meeting. Culpepper and Zweifel attended the meeting, under protest.

The meeting resumed at 5:00 p.m.; the Hursts, Culpepper, and Zweifel were present. As the first order of business, Leon Hurst moved that the board invite Schlanger and Bassett to join the meeting. William Charles Hurst seconded the motion, it passed, Culpepper voting against it, and Schlanger and Bassett entered the room. Next, Leon Hurst moved that the court reporter join them. The motion passed, Culpepper again voting no. After the court reporter entered the room and began transcribing what took place, Culpepper objected to any further proceedings on the ground that the meeting had been improperly called. In his view, because the meeting at the Lokey & Bowden law office had been adjourned, it could not be resumed without three days' notice, as provided in the bylaws; consequently, any action taken at that time would be null and void. The Hursts ignored Culpepper's objection and proceeded with the agenda set forth in the written notice they had given Culpepper on February 12. Turning to that agenda, the Hursts, over Culpepper's negative vote, (1) replaced themselves as the company's vice president and secretary/treasurer with James Lurwig; (2) gave Lurwig most of Culpepper's authority as company president; and (3) replaced Lokey & Bowden with Cofer, Beauchamp,

Hawes & Harrold as counsel for the company.[34]

Following these events of February 15, a potential purchaser of House of Travel's assets appeared on the scene and for three weeks—until it became apparent that a deal could not be made—the parties put aside their differences. On March 10, hostilities resumed—at a board of directors meeting. All three directors were present, together with their attorneys—Gary P. Bunch[35] representing Culpepper and Schlanger representing the Hursts (and therefore Pelletier). Bassett also attended the meeting—to protect Pelletier's interests. The agenda was the same as the agenda set forth in the Hursts' notice of the February 15 board meeting. Over Culpepper's negative vote, the Hursts ratified the actions taken on February 15, and they went one step further: they fired Culpepper as company president and gave the office to James Lurwig.

On March 12, James Lurwig had his first contact with House of Travel's employees. He visited the company's Buckhead office, where most of the employees were stationed, introduced himself as the new president, and, after indicating what he expected from them, asked for their cooperation. Schlanger and Pelletier were present when Lurwig addressed the employees; the record, however, does not indicate what their participation, if any, may have been. During Lurwig's meeting with the employees, either Culpepper or Bunch made a telephone call to the Buckhead office. The receptionist took the call and, when the meeting was over, told her co-employees that Culpepper wanted to see them at the company's branch office in Smyrna. Several employees went to the branch office and met with Culpepper and Bunch. They returned late that afternoon. Lurwig was still there. They told him that they would not feel comfortable working for him, picked up their belongings, and left.[36]

**34.** The Hursts took other action as well, but none is pertinent here.

**35.** At the time he retained Nicholas P. Chilivis, Culpepper also retained Gary P. Bunch. They practiced in separate law firms.

**36.** One employee, Emily Langston, remained.

Sometime during the afternoon of March 12, Bunch telephoned Donald Rickertsen, a lawyer who specialized in bankruptcy matters. House of Travel's financial condition had been deteriorating, and the litigation pending against the company was threatening to put it under. Bunch thought that a chapter 11 reorganization might benefit the company and wanted Rickertsen's advice. After a brief conversation, they decided that a meeting that evening with Culpepper and Zweifel would be helpful.

■ They met at Zweifel's office, and Culpepper and Zweifel briefed Rickertsen on House of Travel's recent history. Zweifel advised Rickertsen that, as far as he was concerned, Culpepper was still the company's president and that his firm was still its counsel. Zweifel, of course, knew that House of Travel's board of directors had fired Culpepper on March 10; he felt, however, that the board's action was invalid. In his view, nothing the board had done at the behest of the Hursts had any validity. He considered the Hursts—who owned no interest in the company—to be Pelletier's nominees. As such, they had not been functioning as independent directors, as the law required.[37]

After he had been briefed, Rickertsen concluded that chapter 11 proceedings would benefit House of Travel and that Culpepper, as its president, could authorize the filing of a chapter 11 petition. Acting as Culpepper directed, Rickertsen filed the petition the following day, March 13.

Also on March 12, TI's attorneys notified the Hurst Group by letter that TI was rescinding the stock sale agreement it had made with the Hurst Group on November 1, 1984. The letter contained an acknowledgment for the members of the Hurst Group to sign, indicating that TI had rescinded the agreement, and the attorneys asked them to sign it. On March 26, the Hursts and Robinson signed the acknowl-

edgment, as TI had requested; TI's president, in turn, executed an assignment, which sold, assigned, and transferred the 40 shares of House of Travel stock TI had purchased on November 1, 1984, back to William Charles Hurst.

By admitting in writing that TI had purchased its House of Travel stock on November 1, 1984, and that TI had maintained ownership of the stock until it rescinded the purchase on March 26, 1985, the Hurst Group effectively acknowledged that it had no House of Travel stock to sell Pelletier on December 29, 1984. Pelletier had already paid the Hurst Group $142,600 for the stock ($10,000 in cash on December 29, 1984, a check for $82,600, which the Hurst Group was to hold until January 15, 1985, and a $50,000 promissory note due on January 15, 1986), and, moreover, Pelletier, representing himself as a House of Travel stockholder, had filed the shareholders' derivative suit in the state superior court. The Hurst Group had a serious problem on its hands. What if Pelletier or Schlanger, who owed his allegiance to Pelletier, found out about the TI transaction? At the very least, Pelletier would want his money back.

The record does not indicate when, if ever, the Hursts or Pelham Robinson informed Pelletier or Schlanger that they had no House of Travel stock to sell on December 29, 1984; all we know is that Zweifel discovered this fact in the fall of 1987, while he and his law firm were defending the suit Schlanger had brought against them on behalf of Pelletier on January 23, 1986—charging them with having breached the fiduciary duties they owed Pelletier as a House of Travel shareholder.

Meanwhile, Schlanger—apparently believing that Culpepper, who was still holding himself out as the firm's president despite the board's action of March 10, had convinced House of Travel's employees to leave their posts—turned once again to the

---

37. Under the Georgia law, a director must discharge his duties "[i]n a manner he believes in good faith to be in the best interests of the corporation." Ga.Code Ann. § 14–2–830(a)(1) (1989). A director "serves the interests of the entire body of stockholders, as well as those of the individual shareholder." *Oliver v. Oliver,*

118 Ga. 362, 45 S.E. 232, 233 (1903) (emphasis added). Therefore, a director may not become "the active and successful opponent of an individual stockholder," *id.,* but must attempt to promote the interests of *all* stockholders, *see Quinn v. Cardiovascular Physicians, P.C.,* 254 Ga. 216, 326 S.E.2d 460, 463 (1985).

courts for relief; this time, he chose the shareholders' derivative suit Bassett had filed for Pelletier and Langston against Culpepper, House of Travel, and the Hursts on January 16. On March 13, Schlanger, appearing as the Hursts' attorney, filed a cross-claim against Culpepper, seeking compensatory and punitive damages, a declaratory judgment, and preliminary and permanent injunctive relief. Schlanger alleged that, on March 10, 1985, the Hursts, constituting two-thirds of House of Travel's board of directors, had amended the company's bylaws to provide that the board of directors could act on a simple majority vote of its members (rather than the previously required supermajority vote); that, once the bylaws were amended, the board, acting on the Hursts' votes, discharged Culpepper as the company's president; that Culpepper refused to acknowledge the board's action and continued to exercise the authority of the office; that Culpepper was wasting the company's assets in a variety of ways; and that, unless restrained by an injunctive order, he would continue to injure the company. Schlanger asked the court to declare valid the bylaw amendment and Culpepper's discharge, and to enjoin Culpepper from holding himself out as House of Travel's president. Schlanger also asked for compensatory and punitive damages for the injury Culpepper had inflicted on the company.

As soon as he filed his cross-claim, Schlanger moved the court for a temporary restraining order, to prevent Culpepper from interfering with House of Travel's day-to-day operations. Schlanger scheduled a hearing on his motion for 2:00 p.m. that day, March 13, before the superior court judge presiding over the case, and immediately notified all counsel of record— serving them by hand copies of the notice of hearing, the Hursts' cross-claim, and their motion for a temporary restraining order.

The hearing was held as scheduled. Present were five attorneys: Schlanger (representing the Hursts), Bassett (representing Pelletier and Langston), Bunch (representing Culpepper), and Lokey and Handley of Lokey & Bowden (representing House of Travel). Schlanger outlined the facts he had recited in the Hursts' cross-claim and their motion for temporary restraining order.

5. The Bankruptcy Court Takes Control.

While Schlanger and the other attorneys were addressing the superior court, Rickertsen was at the federal courthouse in Atlanta; at 4:41 p.m., he filed a chapter 11 petition for House of Travel. Moments later, the superior court judge announced that he was granting the relief Schlanger was seeking, and would enter a formal written order in the morning. Shortly thereafter, Rickertsen called the judge, informed the judge that he had just filed a chapter 11 petition on behalf of House of Travel, and said that the Hursts' application for a temporary restraining order had been stayed. At that moment, the prosecution of all of Pelletier's, and Langston's, claims in that case ceased. (A few months later, after he sold his House of Travel stock to Elite Travel, Inc., Pelletier dismissed the suit with prejudice.)

The next day, March 14, Cofer, Beauchamp, Hawes & Harrold, having been employed by the Hursts as House of Travel's new counsel, moved the bankruptcy court to dismiss the petition Rickertsen had filed. Schlanger, appearing for the Hursts, joined in the motion. The movants alleged that the petition had been filed without House of Travel's authorization; they represented that Culpepper, who had signed the petition as the company's president, did not occupy that office at the time, and thus had no authority to speak for the company. Before the bankruptcy court could rule on the motion, the parties—Pelletier, Langston, the Hursts, and Culpepper—and Rickertsen, acting as reorganization counsel for the debtor, agreed that the Hursts would ratify the filing of the petition. They also agreed that Lurwig would manage the day-to-day operations of House of Travel as debtor-in-possession. After they reduced their agreement to writing, the Hursts ratified the filing of the petition, and the bank-

ruptcy court rejected as moot the motion to dismiss the chapter 11 proceedings.

### E. *The Pelletier/Elite Travel, Inc. Transaction.*

On May 4, while the bankruptcy proceedings were pending, Pelletier sold his interest in House of Travel, i.e., "all of his right, title and interest in and to any and all shares of stock of [House of Travel] which he may currently have or ever has had," to Elite Travel, Inc. (Elite), a travel agency. The sale was made pursuant to a written agreement, drafted by Schlanger and Bunch, between Elite, Joyce Carson (Elite's president), House of Travel, and Culpepper, "on the one hand," and Pelletier, "on the other." For his interest in House of Travel, Pelletier received $50,000, half in cash and half in the form of a promissory note executed by Elite, Carson, and Culpepper. Pelletier also received from House of Travel a partial assignment of any claims that it might have against Zweifel and Lokey & Bowden. The terms of the assignment were, essentially, as follows: (1) Pelletier alone would decide what claims, if any, House of Travel had against Zweifel and Lokey & Bowden and whether to pursue them; (2) if he decided to bring suit against Zweifel and Lokey & Bowden, Pelletier, with leave of the bankruptcy court, would bring it in House of Travel's name, with a lawyer of his choice, and at his (Pelletier's) expense; and (3) of the net proceeds of any recovery, Pelletier would receive 70%, House of Travel 20%, and Elite 10%. Finally, Pelletier agreed to dismiss with prejudice the two state court suits he had been prosecuting: his (and Langston's) shareholders' derivative suit against Culpepper, House of Travel, and the Hursts, and the Hurst Group's suit against Culpepper for specific performance.

After this transaction, Pelletier's position vis-a-vis Zweifel and Lokey & Bowden was

as follows. First, he could no longer claim that he was a House of Travel shareholder;[38] therefore, he could not bring a shareholders' derivative suit against Zweifel and Lokey & Bowden based on any claims House of Travel may have had against them—he no longer had standing to prosecute such a suit. Second, any claim Pelletier brought against these lawyers would have to be based on their breach of a duty they owed to him. (As we recite *infra*, Pelletier, on January 23, 1986, sued Zweifel and Lokey & Bowden in state court claiming the breach of such a duty. In that suit, he alleged that Zweifel and Lokey & Bowden, as House of Travel's counsel, had a fiduciary duty to him, as a shareholder; that in representing the company they breached this duty; and that, as a result of such breach, he suffered substantial injury—in part through the depreciation in value of his House of Travel stock.) Third, Pelletier could sue Zweifel and Lokey & Bowden in House of Travel's name to recover damages for their breach of a duty owed to House of Travel if the bankruptcy court granted him leave to do so.

Schlanger, representing Pelletier, submitted the Elite agreement to the bankruptcy court on June 3, and requested the court to approve the provision giving Pelletier the right to sue Zweifel and Lokey & Bowden on behalf of House of Travel. Rickertsen opposed Schlanger's request, objecting to the manner in which Schlanger proposed to divide the proceeds of any recovery Pelletier might obtain. Rickertsen thought that House of Travel's share was too small. Before the court could rule on the matter, Schlanger and Rickertsen worked out a new allocation: Pelletier would receive 66⅔% of any recovery, and House of Travel would receive 33⅓%. Schlanger and Rickertsen submitted the new arrangement to the court for approval on October 2, 1985. The court set the matter down for a hearing on October 23,

---

**38.** Actually, as we have already noted, Pelletier never was a House of Travel shareholder; whatever House of Travel stock he thought he owned came from the Hurst Group which had none. Pelletier may not have known this, however, on May 4, 1985, when he sold what he thought was his stock to Elite. For purposes of this appeal,

we assume that, on May 4, 1985, Pelletier did not know that on December 29, 1984—when he made his deal with the Hurst Group—TI, not the Hurst Group, owned the shares the Hurst Group had acquired from Langston on October 14, 1984.

and when no party objected, the court approved it, in a written order, on October 24.

Neither Zweifel nor Lokey & Bowden received a copy of the October 24 order. Several weeks later, a member of the firm learned about it, and on January 13, 1986, Lokey & Bowden (1) moved the court to vacate the order, contending that it had not been given notice of the October 23 hearing —consequently, the order should not stand, and (2) objected to the court's confirmation of a plan that had been proposed for House of Travel's reorganization. Lokey & Bowden served a copy of its motion and its objection on Schlanger, as Pelletier's attorney, by hand the following day, January 14; the same day, the bankruptcy court scheduled a hearing on the matter for January 30, 1986.

Schlanger and Pelletier, realizing that the bankruptcy court might vacate the October 24 order and deny Pelletier permission to sue Zweifel and Lokey & Bowden in House of Travel's name, decided to sue them in Pelletier's name instead. Thus, on January 23, 1986, Schlanger, on behalf of Pelletier, filed a complaint against Zweifel and Lokey & Bowden in the Superior Court of Fulton County charging them with having breached a fiduciary duty they purportedly owed Pelletier. According to the complaint, Zweifel and Lokey & Bowden, as House of Travel's counsel, "had a fiduciary duty to advance the best interests of [the company] and not to prefer the interest of one putative shareholder over that of another. Moreover, because [House of] Travel was a close corporation, the duties of Lokey & Bowden and Mr. Zweifel extended not only to the corporation as a whole, but to each of its shareholders." These attorneys, according to Schlanger's allegations, breached such duty by preferring the interests of Culpepper over those of Pelletier, to wit: Zweifel, after Pelletier had purchased the Hurst Group's House of Travel stock, advised Culpepper not to sign the management agreement that Culpepper had, prior to the purchase, told Pelletier that he would sign; Culpepper's refusal to sign the agreement caused Pelletier to suffer great injury—in particular, loss of shareholder equity and the litigation expenses Pelletier incurred in trying to resolve his dispute with Culpepper; Zweifel and Lokey & Bowden, in representing both Culpepper and House of Travel, had a conflict of interest and should have withdrawn; they did not, and instead, had Culpepper bring House of Travel to the bankruptcy court.[39] According to Pelletier, the conduct of Zweifel and his law firm injured him in an amount in excess of $1 million; he therefore sought compensatory damages in that amount. Pelletier also sought $2 million in punitive damages, alleging that the defendants intended to injure him.

On January 24, the day after this suit was filed, Schlanger served on Lokey & Bowden Pelletier's memorandum in opposition to Lokey & Bowden's motion to vacate the October 24 order of the bankruptcy court. At the same time, Schlanger furnished Zweifel and the law firm a "courtesy copy" of the complaint Pelletier had filed against them in the superior court the day before.

On January 30, the bankruptcy court convened the hearing on Lokey & Bowden's motion to vacate the October 24 order and its objection to the confirmation of the plan to reorganize House of Travel. Present at the hearing were, among others, Robert Bartlett, counsel for Lokey & Bowden, Zweifel, who was there as a party (representing Lokey & Bowden), Schlanger, and Rickertsen. The court first considered the motion to vacate. Bartlett informed the court of the suit Pelletier had brought against Zweifel and Lokey & Bowden on January 23. Reminding the court that the firm had filed a claim, as an unsecured creditor, against the debtor's (House of Travel's) estate, he said that if Pelletier insisted on going forward with his suit, the law firm would have to amend its claim to include whatever expenses and losses it, and Zweifel, sustained because of the litigation. According to House of Travel's bylaws, Bartlett explained, the law firm

---

**39.** Pelletier alleged other acts of misconduct on the part of Zweifel and Lokey & Bowden; such acts are subsumed by the allegations cited in the text above.

**1488**

and Zweifel were entitled to indemnification for any losses they might suffer by reason of their representation of House of Travel. Bartlett therefore asked the court not to confirm the proposed plan of reorganization; rather, the court should defer its confirmation ruling until the law firm could decide whether an amendment of its unsecured claim would be necessary. When the court indicated that, even if it confirmed the plan, it would give Lokey & Bowden the right to file an amended claim later, Bartlett withdrew his objection to confirmation. On February 4, 1986, the court, in a written order, confirmed the proposed plan of reorganization,[40] without prejudice to Lokey & Bowden's and Zweifel's right to file an amended, unsecured creditor's claim in the event they suffered any loss at the hands of Pelletier. The court also vacated its October 24 order, which meant that Pelletier could not sue Zweifel and Lokey & Bowden in House of Travel's name.

### F. The Case at Hand: Pelletier's RICO Suit.

At the conclusion of the January 30 hearing, as Zweifel was leaving the courtroom, a process server presented him with the complaint in the instant case (the RICO suit); Schlanger had filed it, on behalf of Pelletier, in the district court that morning.

The complaint consisted of a chronological history of House of Travel and focused on three of the four stock transactions described above—the Langston/Hurst Group transaction of October 7, 1983; the Pelletier/Hurst Group transaction of December 29, 1984; and the Pelletier/Elite transaction of May 4, 1985[41]—and House of Travel's chapter 11 proceeding in the bankruptcy court. Pelletier alleged that each of these transactions, and the chapter 11 proceeding, was the product of a scheme

that Culpepper had devised in September 1983 (1) to induce his House of Travel coshareholder to sell and/or a third party to buy the coshareholder's House of Travel stock; (2) to induce the purchaser, after the stock changed hands, to obtain working capital for the company; and, then, (3) to bleed the company of its new working capital. According to the complaint, this is how Culpepper executed his scheme. First, whenever House of Travel fell into financial difficulties, Culpepper would look for an investor to replace his coshareholder and to obtain working capital for the company. When he found a good prospect, Culpepper would tout House of Travel as a good investment—that simply needed more working capital. Culpepper would explain that the company's lack of sufficient working capital was due to his coshareholder's misfeasance. When the prospect indicated an unwillingness to purchase a minority interest in the company, Culpepper would promise to give him effective control of the company by vesting him with the power to manage it. If this satisfied the prospect and he agreed to buy out the coshareholder and arrange for new working capital, Culpepper would induce his coshareholder to sell by convincing him that if he did not sell, he would lose his entire investment in House of Travel.

Culpepper, the complaint alleged, devised this scheme sometime prior to October 7, 1983, and he used it for the first time to get Langston to sell, and the Hurst Group to buy, 40 of his 50 House of Travel shares (i.e., 40% of the company). Culpepper purportedly convinced Langston that both of them should sell 40 shares to the Hurst Group, but only Langston completed the transaction. Culpepper, when House of Travel's financial condition subsequently deteriorated, executed his scheme again in December 1984; in an effort to salvage his

---

40. Under the plan, World Travel Advisors, a travel agency, paid $125,000 in cash to House of Travel and House of Travel's shareholders surrendered their shares, receiving nothing in return. House of Travel, as a means of liquidating itself, then formed a new company and transferred most of its assets to it; that company, in turn, was liquidated for the benefit of House of Travel's creditors. In sum, World Travel Advisors acquired House of Travel's

name and the few assets that remained. After these transactions were concluded, Culpepper went to work for World Travel Advisors, as a vice president of the firm.

41. The complaint made no reference to the Hurst Group/TI transaction of November 1, 1984.

investment, he allegedly induced Pelletier to buy out the Hurst Group and to obtain a line of credit for House of Travel. The inducement, according to the complaint, was Culpepper's promise to give Pelletier his, Culpepper's, authority to manage the company; after Pelletier bought the Hurst Group's interest, however, Culpepper reneged on his promise. Culpepper allegedly executed his scheme for a third time on May 4, 1985, inducing Pelletier to sell to Elite the House of Travel shares he had acquired from the Hurst Group.

Zweifel and his law firm, according to the complaint, joined Culpepper's scheme, as coconspirators, in the fall of 1984, shortly before Pelletier purchased the Hurst Group's stock; they joined the scheme, the complaint said, to protect and enhance the stream of income they had been receiving from House of Travel in the form of attorney's fees. Thereafter, Zweifel purportedly became aware of Pelletier's plan to purchase the Hurst Group's interest in House of Travel and Culpepper's intention to induce Pelletier to go forward with the purchase, and to obtain a line of credit for the company, by promising to give Pelletier the authority to manage the company. On January 8, 1985, however, after Pelletier had purchased the Hurst Group's stock and obtained the line of credit, Zweifel counseled Culpepper to renege on his promise and thereby helped Culpepper maintain control over the company. When, in March 1985, the Superior Court of Fulton County, Georgia upheld the decision of House of Travel's board of directors (in which the Hursts, at Pelletier's direction, voted to replace Culpepper as House of Travel's president and Zweifel's law firm as its counsel), Zweifel, with the help of Donald L. Rickertsen, counseled Culpepper to file a chapter 11 petition, and thus put House of Travel in the hands of the bankruptcy court. Zweifel did this, it was alleged, to enable Culpepper to continue his control, at least temporarily, over House of Travel's affairs.

The complaint alleged that, while House of Travel was before the bankruptcy court, four other individuals and two corporations, in addition to Zweifel and his law firm, joined Culpepper's scheme, as coconspirators. They were Rickertsen, who represented House of Travel during the chapter 11 proceeding, Frank Carmines and Charles Crumley, the bankruptcy examiner and auditor, respectively, assigned to the chapter 11 case, Elite and its president, Joyce Carson, and House of Travel. Collectively, these coconspirators helped Culpepper get rid of Pelletier, as Culpepper's coshareholder in House of Travel, by fraudulently inducing Pelletier to sell his House of Travel stock to Elite. The fraud was principally this. Part of the consideration Pelletier received for the stock was House of Travel's assignment to Pelletier of any claims it may have had against Zweifel and Lokey & Bowden; Pelletier could not sue on these claims, however, without the bankruptcy court's approval. Rickertsen and Carmines, acting for all of the coconspirators, promised Pelletier that they would not oppose the granting of such approval, but they did not intend to abide by their promise; when Pelletier, through Schlanger, petitioned the bankruptcy court for leave to sue, Rickertsen and Zweifel objected and the court sustained their objection. As a result, Pelletier was never able to sue Zweifel and Lokey & Bowden on House of Travel's claims, and, according to Pelletier, a substantial portion of the consideration he received for his House of Travel stock thus went for naught.

Pelletier alleged that the foregoing conduct rendered Zweifel liable to him for money damages on ten grounds, or counts. Count one alleged that Zweifel and his coconspirators had violated four federal RICO criminal provisions, 18 U.S.C. §§ 1962(a)–(d) (1988), and sought treble damages under RICO's civil remedies statute, 18 U.S.C. § 1964(c) (1988), for these violations. Section 1962(a) makes it a crime for anyone who has derived income from "a pattern of racketeering activity ... in which such person has participated as a principal ... to use or invest, directly or indirectly, any part of such income ... in acquisition of any interest in, or the establishment or operation of, any enterprise ... engaged in ... interstate ... commerce." Pelletier alleged that Zweifel

violated section 1962(a) in that, while representing House of Travel and Culpepper as an attorney, he received such income and invested it in the operation of the following enterprises engaged in interstate commerce: House of Travel, Lokey & Bowden, and the Bankruptcy Court for the Northern District of Georgia. The pattern of racketeering activity that allegedly generated the income, and in which Zweifel supposedly engaged, consisted of the criminal acts, called "predicate acts," of mail,[42] wire,[43] securities,[44] and bankruptcy[45] fraud; using interstate facilities to further an unlawful activity;[46] extortion under color of official right;[47] state law barratry;[48] state law false statements;[49] and witness tampering, in violation of both federal and state law.[50]

Section 1962(b) imposes criminal liability on anyone, who "through a pattern of racketeering activity ... acquire[s] or maintain[s], directly or indirectly, any interest in or control of any enterprise ... engaged in ... interstate ... commerce." Pelletier alleged, in count one, that Zweifel, through the predicate acts described above, maintained an interest in or control of the same three enterprises: House of Travel, Lokey & Bowden, and the bankruptcy court.

Section 1962(c) makes it a crime for any person "employed by or associated with any enterprise engaged in ... interstate ... commerce ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Pelletier alleged that Zweifel, while employed or associated with House of Travel, Lokey & Bowden, and the bankruptcy court conducted or participated in the conduct of their affairs through the commission of the predicate acts described above.

Section 1962(d) makes it a crime for anyone to conspire to violate the substantive offenses of sections 1962(a)–(c). Pelletier alleged that Zweifel's conduct, as described in the complaint, violated this conspiracy provision. Pelletier, however, did not point to the particular conduct that constituted a violation of section 1962(d). Rather, in alleging this RICO violation—and those above (sections 1962(a), (b), and (c)), Pelletier simply left it to the reader to discern which allegations of fact gave rise to Zweifel's liability under RICO.

Counts two through nine of Pelletier's complaint sought money damages for several predicate acts that allegedly gave rise to the count one RICO violations. Count two of Pelletier's complaint alleged that Zweifel, in counseling Culpepper to renege on his promise to transfer managerial control over House of Travel's affairs to Pelletier and in failing to inform Pelletier of the extent of the Hurst Group's misappropriation of the company's funds, committed securities fraud in violation of 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1990) (hereinafter Rule 10b–

**42.** 18 U.S.C. § 1341 (1988) (making it a crime to use the mails in furtherance of a scheme to defraud).

**43.** 18 U.S.C. § 1343 (1988) (making it a crime to use wire, radio, or television communications in furtherance of a scheme to defraud).

**44.** The complaint did not specify which federal securities laws Zweifel and Culpepper allegedly violated.

**45.** 18 U.S.C. § 152 (1988) (making it a crime knowingly or fraudulently to make a false declaration, certification, verification, or statement in connection with a bankruptcy proceeding).

**46.** 18 U.S.C. § 1952 (1988) (generally dealing with activities such as unlawful gambling, trans-

portation of alcohol, narcotics, prostitution, extortion, arson, and bribery).

**47.** 18 U.S.C. § 1951 (1988) (making it a crime to interfere with interstate commerce through the wrongful use of threats made under color of official right).

**48.** Ga.Code Ann. § 16–10–95 (1988) (making it a crime knowingly to stir up groundless litigation).

**49.** Ga.Code Ann. § 16–10–20 (1988) (making it a crime to make a false statement in any matter within the jurisdiction of any state agency or department).

**50.** 18 U.S.C. § 1503 (1988) (making it a crime to impede any juror or officer of the court from performing his duties); Ga.Code Ann. § 16–10–93 (1988) (making it a crime to deter a witness from testifying truthfully and freely).

5).[51] Counts three, four, and five alleged that Zweifel, by engaging in such conduct, also committed securities fraud in violation of 15 U.S.C. §§ 77*l* (1), (2) [52] and 77q(a),[53] and the Georgia code, Ga.Code Ann. § 10–5–12 (1989),[54] and count six alleged that, by engaging in such conduct, he committed common law fraud. Count seven alleged that Zweifel breached his fiduciary duty to Pelletier, as a House of Travel shareholder (in essence, the same claim Pelletier raised in the state court suit he filed against Zweifel and Lokey & Bowden on January 23, 1986). Count eight alleged that Zweifel had committed state law barratry,[55] presumably by advising Rickertsen that Culpepper was still House of Travel's president and had authority to file a chapter 11 petition on its behalf. Count nine alleged that Zweifel made false statements,[56] presumably to the state superior court (in Pelletier's, and Langston's, shareholders' derivative suit or in the Hurst Group's suit for specific performance) and in an affidavit he signed with respect to the Culpepper–Langston–Hurst Group transaction. Finally, in count ten, Pelletier alleged that Zweifel injured him through state law racketeering activity in violation of Ga. Code Ann. § 16–14–1 *et seq.* (1988).[57]

**51.** These provisions prohibit the use of any fraudulent or manipulative device in connection with the purchase or sale of a security.

**52.** This provision prohibits any person who sells or offers to sell a security from knowingly using any false statement in any communication made in connection with the sale or offer to sell.

**53.** This provision prohibits essentially the same conduct as prohibited by 15 U.S.C. § 78j(b) and Rule 10b–5.

**54.** This provision is the state law equivalent of section 78j(b) and Rule 10b–5.

**55.** *See supra* note 48.

**56.** *See supra* note 49.

**57.** These provisions are essentially identical to the federal RICO provisions.

**58.** Zweifel observed in his alternative motion that all of Pelletier's claims were based on fraud and that the fraud had not been pled with the particularity required by Fed.R.Civ.P. 9(b). Zweifel asked the court to dismiss Pelletier's claims for this reason. In such a situation,

Zweifel, on February 20, moved the court to dismiss Pelletier's RICO suit for failure to state a claim for relief or, alternatively, to require Pelletier to file a more definite statement, contending that Pelletier's allegations were so muddled that he could not frame a responsive pleading.[58] The next day, February 21, Zweifel and Lokey & Bowden removed Pelletier's state court suit (brought on January 23) to the federal district court, contending that the suit involved a matter pending in the bankruptcy court and thus, under 28 U.S.C. § 1334 (1988), fell within the district court's subject matter jurisdiction. Then, on February 28, they answered Pelletier's complaint in that suit. In their answer, they alleged that Pelletier was not, and had never been, a House of Travel shareholder;[59] therefore, he could not recover from them on the theory that their conduct depreciated his ownership interest in the company. They alleged, alternatively, that, assuming that Pelletier had been a House of Travel shareholder during the relevant period, they could not be liable to him for breaching the fiduciary duty described in his complaint because no such duty existed under Georgia law.[60] Accordingly, as a

however, the rules contemplate a repleader, not a dismissal; hence, we treat Zweifel's alternative motion as requesting a more definite statement under Fed.R.Civ.P. 12(e) rather than a dismissal.

**59.** Pelletier's complaint was ambiguous with respect to his ownership of House of Travel stock; he alleged that he had acquired such stock from the Hurst Group, but he did not indicate whether he still owned the stock or, if he did not, when he parted with it.

**60.** It is a black letter principle of corporation law that a corporation's counsel does not owe the fiduciary duty Pelletier described to the corporation's shareholders. *See* 3 W. Fletcher, Cyclopedia of the Law of Private Corporations § 839, at 204 (rev.ed.1986); this principle, that a corporation's attorney owes no such fiduciary duty to the corporation's shareholders, applies both to close and publicly traded corporations. *See Egan v. McNamara,* 467 A.2d 733, 738–39 (D.C.Ct.App.1983). In sum, if Zweifel and Lokey & Bowden breached a fiduciary duty while representing House of Travel, it was a duty owed to House of Travel, not Pelletier. Under Georgia law, House of Travel, alone, had the

separate affirmative defense, Zweifel and Lokey & Bowden alleged that the complaint failed to state a claim for relief.

The same day, February 28, that Zweifel and Lokey & Bowden filed this answer to Pelletier's state court complaint (which they had removed to the district court), the district court heard the alternative motions Zweifel had addressed to Pelletier's RICO suit. When the hearing began, District Judge G. Ernest Tidwell, to whom the case had been assigned, told Schlanger, who was there for Pelletier, that he was "treading on mighty dangerous grounds"; he then asked Schlanger if he was "familiar with Rule 11." Schlanger replied that he was familiar with the Rule and did not think he was violating it. He said, "we have got more facts on this case than any ... RICO case I know that's been filed in this court." The court countered this statement by observing that the pivotal allegations of Pelletier's complaint constituted nothing more than bald conclusions and that, if Schlanger wanted to pursue the case, he would have to amend his complaint. As the hearing progressed, Judge Tidwell indicated that his respect for Hamilton Lokey was such that he might not be able to be fair to Pelletier; accordingly, he said that he would probably recuse himself. He did so on March 3, without ruling on Zweifel's motion to dismiss, and the case was assigned to District Judge Orinda D. Evans. She presided over the case to its conclusion.

On March 19, Zweifel and Lokey & Bowden moved the district court for judgment on the pleadings in the state court suit they had removed to federal court, i.e., they asked the court to decide the case on the basis of their affirmative defense of failure to state a claim for relief. Before the court could issue a ruling, however, Pelletier moved the court to remand the proceedings to the state court.

On April 7, Schlanger filed an amended complaint, the complaint now before us, in Pelletier's RICO suit. The new complaint was seventy pages long and incorporated by reference four large volumes of evidentiary exhibits. The amended complaint replicated, in substance, the allegations in Pelletier's original complaint. As before, however, Schlanger did not connect his factual allegations with his legal conclusions. Framed in eight counts, the amended complaint repled eight of the ten counts of the original complaint; counts six and seven of the original complaint, asserting common law fraud and breach of fiduciary duty claims, had been dropped, and counts eight, nine, and ten of the original complaint became counts six, seven, and eight of the amended complaint. On April 18, Zweifel moved the court to dismiss the amended

right to sue; as the Supreme Court of Georgia has stated, "the right of action for wrongs suffered by the corporate interests is in the corporation, and an action for such wrongs cannot be maintained by a stockholder, however injuriously it may affect him." *Smyly v. Smith,* 216 Ga. 529, 118 S.E.2d 188, 189 (1961); *see Dale v. City Plumbing & Heating Supply Co.,* 112 Ga.App. 723, 146 S.E.2d 349, 354 (1965). The Georgia Supreme Court has recognized a narrow exception to this general rule: if the reasons underlying the rule are not present in a particular case, then an aggrieved shareholder may be allowed to proceed directly against the alleged wrongdoer. *See Thomas v. Dickson,* 250 Ga. 772, 301 S.E.2d 49, 51 (1983). A trial judge should, according to the Georgia Supreme Court, answer four questions in the affirmative before invoking the exception: (1) would a derivative suit prevent a multiplicity of suits? (2) would a derivative suit protect creditors by recovering funds for the corporation? (3) would a derivative suit protect other shareholders by increasing the value of the shares? and (4) would the aggrieved shareholder be compensated by a derivative action that led to an increase in the value of his shares? *Id.* In Pelletier's case, a trial judge could not answer yes to each of these questions; thus, it is clear that Pelletier could not have fallen within the limited class of shareholders allowed to proceed directly against a wrongdoer based on the corporation's claim.

In seeking to recover for wrongs suffered by the corporation, the shareholder must follow the procedures applicable to shareholders' derivative suits. The person complaining must be a shareholder (which Pelletier was not when he brought the state court action against Zweifel and Lokey & Bowden), Ga.Code Ann. § 14–2–741 (1989), and must have made a written demand on the corporation to take suitable action (which Pelletier did not do), *id.* § 14–2–742. In essence, then, the suit Pelletier brought against Zweifel and his law firm was a shareholders' derivative suit; he brought it, though, without satisfying any of the conditions precedent to bringing such an action.

complaint for failure to state a claim for relief or, alternatively, to require Pelletier to file a more definite statement.[61]

On April 24, 1986, while he was preparing his memorandum in opposition to Zweifel's motion to dismiss Pelletier's amended complaint in the RICO case, and while the district court was considering Zweifel's and Lokey & Bowden's motion for judgment on the pleadings in the removed state court action, Schlanger returned to the bankruptcy court and House of Travel's chapter 11 proceeding and filed an "Application to Permit the Pursuit of Certain Claims and Causes of Action." In this application, he represented that House of Travel had some meritorious malpractice claims against Zweifel and Lokey & Bowden and asked the court to allow Pelletier to pursue them in another forum. Schlanger also proposed a new allocation of any recovery that might result: 60% would go to Pelletier and 40% to House of Travel. (The original Elite agreement, as noted *supra*, had provided that Pelletier would receive 70%, House of Travel 20%, and Elite 10% of any recovery Pelletier obtained.) The bankruptcy court advised Schlanger that it would not rule on his application until it could assess the strength of House of Travel's claims against the lawyers. To assist it in making such an assessment, the court appointed an attorney, John J. Goger, to examine the claims and to determine whether granting the application would be in the best interest of the debtor's estate.

On September 22, 1986, Pelletier's litigation against Zweifel—his removed state court action against Zweifel and Lokey & Bowden and his RICO suit against Zweifel—was once again divided when Judge Evans, granting Pelletier's motion to remand, sent Pelletier's suit against Zweifel and Lokey & Bowden back to state court. In remanding the case, she left undecided the defendants' motion for judgment on the pleadings (based on their affirmative defense of failure to state a claim for relief) and directed them to present the motion to the state court. They did so, and the state court denied the motion.

On October 2, 1986, in the RICO case, Judge Evans heard argument on Zweifel's alternative motions to dismiss or for a more definite statement and took them under advisement. That same day, Goger, having finished the task the bankruptcy court had given him, presented his findings to the court. As noted, Goger had been told to evaluate the claims that Schlanger contemplated bringing against Zweifel and Lokey & Bowden. He focused, in particular, on Schlanger's claim that Zweifel had fraudulently induced Pelletier to purchase the Hurst Group's House of Travel shares, on December 29, 1984, by persuading Culpepper not to enter into the management agreement Culpepper had told Pelletier that he would sign. Goger also examined Schlanger's claims that Zweifel and his firm had engaged in abusive litigation tactics in defending House of Travel in Pelletier's (and Langston's) shareholders' derivative suit; that Zweifel had, without cause, prevented the sale of House of Travel's assets to willing purchasers; that Zweifel had prevented Culpepper and Pelletier from settling their differences; and that Zweifel and Lokey & Bowden had committed bankruptcy fraud by having Culpepper file an unauthorized chapter 11 petition in behalf of House of Travel. After a thorough review of the evidence, Goger concluded, and reported to the bankruptcy court, that "there does not appear to be substantial justification for a lawsuit against [Zweifel and] Lokey & Bowden asserting an entitlement to damages for alleged negligence and breaches of fiduciary duties." Goger referred the court to Fed. R.Civ.P. 11 and stated that, "[w]hile any litigation presents uncertainties, and the discovery of new facts is certainly possible, the possibility of affirmative recovery in the instant case is sufficiently remote, and the possibility of an award under Rule 11 ... is sufficiently great that the pursuit of the asserted claims of [House of Travel] against Lokey & Bowden should not be undertaken." Goger therefore recommended that the court deny Pelletier's application.

---

**61.** *See supra* note 58.

Schlanger, of course, and Pelletier received a copy of Goger's report. They objected to Goger's recommendation, and the court held a hearing on whether to grant Pelletier's application. Schlanger appeared at the hearing and argued in support of the application. Goger, in response, defended his recommendation. He repeated the statement he had made in his report about the possibility of Rule 11 sanctions if Pelletier sued Zweifel and Lokey & Bowden; in Goger's opinion, the risk of sanctions counseled against the bringing of suit. The bankruptcy court agreed, and denied Pelletier's application on December 3, 1986.

On January 9, 1987, Judge Evans ruled on Zweifel's alternative motions—for dismissal or for a more definite statement—in the RICO case. The court dismissed counts three, four, six, seven, and eight for failure to state a claim for relief: count three, a federal securities claim under 15 U.S.C. §§ 77l(1), (2), did not state a claim for relief since an indispensable element of that claim was that the defendant sold securities—yet neither Zweifel nor his clients sold securities to Pelletier; counts four, securities fraud in violation of 15 U.S.C. § 77q(a), six, state law barratry, and seven, state law false statements, failed because the statutory provisions they relied upon did not create private rights of action; and count eight, the Georgia RICO claim, failed because Pelletier had not pled any predicate acts of racketeering. Finally, the court struck from count one, as immaterial or as insufficient, all references to the predicate acts of extortion, barratry, false statements, and witness tampering. Judge Evans did not grant Pelletier leave to replead any of these counts, and Pelletier did not ask her to amend her order to allow him to do so.[62]

Seven months later, on August 7, 1987, Pelletier moved for leave to file a second amended complaint. The proposed complaint strengthened his Georgia RICO claim by alleging several predicate acts of racketeering. It deleted, however, all reference to his federal securities claims under 15 U.S.C. §§ 77l and 77q, and dropped the false statements and barratry counts (although they were retained as predicate acts for the Georgia RICO claim). Pelletier also sought to assert a new claim—the claim he had brought against Zweifel (and Lokey & Bowden) in the state superior court on January 23, 1986.

That same day, August 7, Zweifel moved for summary judgment on the remaining counts of the amended complaint: count one (the RICO claim based on Zweifel's alleged violations of subsections (a) through (d) of section 1962), count two (the securities fraud claims under section 78j(b) and Rule 10b–5), and count five (the securities fraud claims under Georgia's equivalent of Rule 10b–5).

In October 1987, while his motion for summary judgment was pending in the district court, Zweifel discovered that the Hurst Group did not have any House of Travel stock to sell to Pelletier on December 29, 1984; it had already sold all of its House of Travel shares to TI. Armed with this information, Zweifel moved the district court for leave to file a supplemental affidavit in support of his motion for summary judgment and to engage in further discovery. (At the same time, Zweifel and Lokey & Bowden, relying on Zweifel's discovery of the Hurst Group's sale to TI, moved the state court for summary judgment in Pelletier's tort action against them. The court denied their motion, and they appealed. *See infra* at 1495.) In his motion, Zweifel asserted that Pelletier never owned any House of Travel shares and, consequently, could not prevail on any claims whose sufficiency depended on Pelletier's ownership of such stock. The district court granted Zweifel's motion, observing that the Hurst Groups' sale to TI was "highly material" to Pelletier's claims against Zweifel.

---

**62.** Pelletier could not have cured counts three, four, six, and seven; the elements necessary to state those claims were simply missing. He may have been able, however, to cure the deficiency in count eight by alleging some predicate acts of racketeering activity—if, in fact, Zweifel had committed one or more of them.

On January 6, 1988, Judge Evans denied Pelletier's motion for leave to file a second amended complaint, noting that Pelletier had delayed too long before he moved to amend—a full seven months since she had entered the dismissal order. Judge Evans also observed that the new state law claim that Pelletier wished to bring was still being litigated in state court and that if he wished to bring this claim in federal court he should have brought it in his original complaint as a pendent claim. (Pelletier does not challenge this ruling in his present appeal; rather, he stands on the allegations in his amended complaint.)

On August 11, 1988, the district court granted Zweifel's motion for summary judgment, dismissing the remaining counts of Pelletier's amended complaint—counts one, two, and five—and entered final judgment for Zweifel. The court granted the motion because the record simply failed to establish that Zweifel committed any of the fraudulent acts charged in these counts. The court's approach assumed that all of the fraudulent acts were actionable—there simply was no evidence of Zweifel's knowing participation in them. After the district court had disposed of Pelletier's case, Zweifel moved the court to impose sanctions, under Fed.R.Civ.P. 11, against Pelletier and his attorney, Schlanger.

On April 24, 1989, before the district court could rule on Zweifel's Rule 11 motion, Pelletier took an appeal, No. 89–8334, from the district court's final judgment dismissing his case. While his appeal was being briefed, the Georgia Court of Appeals decided the appeal in Pelletier's tort action against Zweifel and Lokey & Bowden. *See Lokey & Bowden v. Pelletier*, 192 Ga.App. 470, 385 S.E.2d 90 (1989). The court held that the appellant attorneys were entitled to summary judgment against Pelletier since the evidence demonstrated as a matter of law that Pelletier was never a House of Travel shareholder; TI owned the shares the Hurst Group supposedly sold him on December 29, 1984, and did not rescind its purchase of those shares until it provided written notice to the Hurst Group on March 12, 1985. Pelletier petitioned the Supreme Court of Georgia to issue a writ of certiorari setting aside the court of appeals' decision, but the supreme court denied his petition on September 7, 1989.

On July 10, 1989, the district court denied Zweifel's Rule 11 motion for sanctions, and Zweifel appealed, No. 89–8667. We thereafter granted the parties' motions to consolidate the appeal with the appeal in No. 89–8334. We now affirm the district court's final judgment in No. 89–8334. We reverse its order in No. 89–8667 denying Rule 11 sanctions, and remand the case so that sanctions may be imposed.

## II.

In his appeal, Pelletier challenges the district court's summary disposition, under Fed.R.Civ.P. 56, of counts one (federal RICO), two (federal securities fraud), and five (state securities fraud) of his amended complaint, and its dismissal, under Fed.R. Civ.P. 12(b)(6), of counts six (state law barratry), seven (state law false statements), and eight (state RICO) of that complaint. We now address Pelletier's challenges to these counts.

## A.

Section 1964(c) of title 18 of the United States Code, the federal civil RICO provision, provides that "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. §] 1962 ... may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964 (1988). Sections 1962(a), (b), and (c) of title 18 make criminally liable those who engage in, or aid and abet another to engage in, a pattern of racketeering activity if they also do the following: invest income derived from the pattern of racketeering activity in the operation of an enterprise engaged in interstate commerce (section 1962(a)); acquire or maintain, through the pattern of racketeering activity, any interest in or control over such an enterprise (section 1962(b)); or conduct, or participate in the conduct of, the

affairs of such an enterprise through a pattern of racketeering activity (section 1962(c)). Section 1962(d) makes it a crime to conspire to violate sections 1962(a), (b), or (c).[63]

Pelletier contends that he has made out a case against Zweifel in count one, sufficient to withstand summary judgment, under each of section 1962's substantive provisions, subsections (a), (b), and (c). That is to say, the record shows that Zweifel committed, or aided and abetted Culpepper in committing, a pattern of racketeering activity—namely mail, wire, securities, and bankruptcy fraud—which affected an enterprise engaged in interstate commerce—namely House of Travel and Lokey & Bowden[64]—in a manner described in subsections (a), (b), and (c) of section 1962. Pelletier also contends that he established a case against Zweifel under subsection (d).

We conclude that Pelletier has no case under any of the section 1962 subsections because he has failed to establish the element indispensable to criminal liability under those subsections—a pattern of racke-

teering activity. In particular, Pelletier has failed to establish that Zweifel committed, or aided and abetted, even a single act of racketeering which "injured his business or property" as required by section 1964(c) as a condition precedent to civil liability.[65]

1.

■ An act of racketeering, commonly referred to as a "predicate act," is defined to include, *inter alia*, acts of mail and wire fraud, bankruptcy fraud, and fraud in the sale of securities. 18 U.S.C. § 1961(1) (1988). A "pattern" of racketeering activity is shown when a racketeer commits at least two distinct but related predicate acts. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985); *Bank of Am. Nat'l Trust & Sav. Ass'n v. Touche Ross & Co.*, 782 F.2d 966, 971 (11th Cir.1986).

■ Predicate acts are related if they " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are

---

**63.** Section 1962 provides in full:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern of racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any

interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

**64.** In his original complaint, Pelletier alleged that the Bankruptcy Court for the Northern District of Georgia also was an enterprise within the meaning of the RICO statutes. He abandoned this allegation when he filed his amended complaint.

**65.** In the present case, we need not decide whether the record supports an inference that the alleged cooperation between Zweifel and Culpepper constituted an "enterprise"; Pelletier's case fails because there simply is no evidence in the record from which we can infer that Zweifel committed, or aided and abetted the commission of, *any* predicate acts or that, assuming Zweifel did so, Pelletier suffered injury by reason of those acts.

not isolated events.'" *See Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (quoting 18 U.S.C. § 3575(e) (1988)).[66] In other words, if Pelletier is to succeed on his federal RICO claim, then he must show that Zweifel engaged in a pattern of acts involving mail fraud, 18 U.S.C. § 1341, wire fraud, *id.* § 1343, bankruptcy fraud, *id.* § 152, or securities fraud, 15 U.S.C. § 78j(b), Rule 10b–5, or that Zweifel aided and abetted Culpepper in the commission of these acts, *see Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47–48 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).[67]

■ Private litigants can recover for racketeering injuries under 18 U.S.C. § 1964(c), but their injury must "flow from the commission of the predicate acts." *Sedima,* 473 U.S. at 497, 105 S.Ct. at 3285. This means that a private plaintiff who wants to recover under civil RICO must show some injury flowing from one or more predicate acts. A plaintiff cannot allege merely that an act of racketeering occurred and that he lost money. He must show a causal connection between his injury and a predicate act. If no injury flowed from a particular predicate act, no recovery lies for the commission of that act.

## 2.

As noted, Pelletier contends that the record establishes Zweifel's involvement in

**66.** Although it is questionable whether some of the predicate acts alleged by Pelletier are "related" for purposes of section 1962, we need not reach that issue since Pelletier's RICO claim fails for more fundamental reasons.

**67.** If, however, Pelletier could show that Zweifel conspired with Culpepper, pursuant to section 1962(d), to commit a pattern of racketeering activity, he could recover treble damages if Culpepper, in furtherance of the conspiracy, committed a single predicate act that injured him.

**68.** Pelletier also alleged as a predicate act that Zweifel used interstate facilities to further an unlawful activity, in violation of 18 U.S.C. § 1952. Section 1952 prohibits the use of interstate facilities to distribute the proceeds of, or further, an "unlawful activity." As we note above, *see supra* note 46, however, section 1952(b) defines an "unlawful activity" as an

four predicate acts: bankruptcy fraud, mail fraud, wire fraud, and securities fraud.[68] We address these predicate acts in turn.

### a.

■ According to Pelletier, Culpepper committed bankruptcy fraud when he signed and filed the chapter 11 petition without authority because the board of directors had removed him from his position as president of House of Travel. Moreover, Pelletier alleges, Zweifel knew that Culpepper was no longer president and that he did not have authority to file the petition. Nevertheless, Zweifel counseled Culpepper to proceed, representing to Rickertsen, the bankruptcy attorney, that Culpepper was still president. We accept these allegations as true. Culpepper signed, under penalty of perjury, the petition as president of House of Travel.

A person commits bankruptcy fraud if he "knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury ... in or in relation to any case under title 11." 18 U.S.C. § 152. We assume, without deciding, that Culpepper might have committed bankruptcy fraud by signing the petition as president, knowing that he no longer occupied that position.[69] We further assume that Zweifel knowingly aided and abetted Culpepper's commission of bankruptcy fraud.

illegal business enterprise involving gambling, liquor, narcotics, prostitution, extortion, bribery, arson, money laundering, or a failure to comply with certain financial reporting requirements. As the district court observed, Pelletier has not alleged that Zweifel or Culpepper had engaged in any "unlawful activity." Section 1952 therefore provides no basis for a predicate act in this case.

**69.** This assumption is based on several tenuous subsidiary assumptions: (1) that the board of directors meeting at which Culpepper was fired was properly noticed and called; (2) that Culpepper knew the meeting was proper; (3) that the resolution firing Culpepper was valid; (4) that Culpepper knew the resolution was valid; and (5) that Culpepper not only knowingly, but also *fraudulently,* declared that he was president of the company. Again, for the sake of showing that Rule 11 sanctions are justified, we make these assumptions in Pelletier's favor.

Even if Zweifel committed bankruptcy fraud, Pelletier still has not shown that he was injured by reason of this predicate act. Only one week after Culpepper filed the chapter 11 petition, the Hurst Group through Schlanger (Pelletier's lawyer) agreed to ratify the filing, causing the bankruptcy court to treat the Hurst Group's motion to dismiss the case as withdrawn and to go forward with the bankruptcy proceeding. In fact, Pelletier expressly consented to the bankruptcy court's treatment of the Hurst Group's motion to dismiss. Had the Hurst Group prosecuted its motion to dismiss and the court found that Culpepper was not president of the company and thus lacked authority to file the petition, then the court would have dismissed the petition. Consequently, the Hurst Group's, and Pelletier's, decision to ratify the petition was the proximate cause of the bankruptcy court's continued control over House of Travel. *Cf. In re Valles Mechanical Indus.*, 20 B.R. 355, 356 (Bankr.N.D.Ga.1982) (board of directors may ratify unauthorized petition filed by president of company).

Moreover, Pelletier has not presented any evidence from which we could infer that House of Travel was a solvent and going concern when Culpepper filed the petition. Indeed, the record clearly discloses that the company was insolvent. Thus, we are simply at a loss to understand how a stockholder could be injured when his insolvent company is placed under the protection of chapter 11. A reorganized company is certainly worth more to a stockholder than an insolvent one.[70]

We hold that Pelletier would be incapable of proving at trial that the alleged bankruptcy fraud proximately caused him injury.[71] Accordingly, Zweifel was entitled to summary judgment on this point as well.

b.

The elements of mail and wire fraud are identical, *Carpenter v. United States*, 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 320 n. 6, 98 L.Ed.2d 275 (1987); therefore, we consider these predicate acts together. Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme. *United States v. Downs*, 870 F.2d 613, 615 (11th Cir.1989).

A scheme to defraud need not be carried out to constitute a violation of the mail and wire fraud statutes. These statutes punish unexecuted, as well as executed, schemes. *See Durland v. United States*, 161 U.S. 306, 313–15, 16 S.Ct. 508, 511–12, 40 L.Ed. 709 (1896); *Shale v. United States*, 388 F.2d 616, 618 (5th Cir.), *cert. denied*, 393 U.S. 984, 89 S.Ct. 456, 21 L.Ed.2d 445 (1968).[72] This means that the government can convict a person for mail or wire fraud even if his targeted victim never encountered the deception—or, if he encountered it, was not deceived. Instead, the court uses a reasonable person test to determine whether, if the scheme had been executed, the intended victim would have acted on the misrepresentations: were the misrepresentations "reasonably calculated to *deceive* persons of ordinary prudence

---

**70.** Pelletier also alleges that Culpepper, with Zweifel's advice, *attempted* to pay his attorneys with House of Travel funds just prior to bankruptcy and that, after bankruptcy, he sought to give Lokey & Bowden airline tickets in partial payment for their fees. Unless Culpepper carried out these depredations, an allegation Pelletier does not make, we fail to see how Pelletier suffered injury by reason of them. In any case, there is no evidence that Zweifel participated in, or aided and abetted, any of Culpepper's conduct.

**71.** On the day after the January 8 meeting with Culpepper and Zweifel, Pelletier wrote to his litigation attorney, Peter Q. Bassett, regarding the strategy to take in light of the preceding

day's events. Pelletier told Basset to do several things, including, "[a]s economic pressure, hav[ing] several of the corporate lenders place [House of Travel] in default." Assuming that the bankruptcy fraud allegation did go to trial, we wonder how Pelletier would explain to the jury that he was injured by the filing of the chapter 11 petition when he was attempting to drive House of Travel at least to the brink of bankruptcy.

**72.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

and comprehension." *United States v. Bruce,* 488 F.2d 1224, 1229 (5th Cir.1973), *cert. denied,* 419 U.S. 825, 95 S.Ct. 41, 42 L.Ed.2d 48 (1974); *see United States v. Netterville,* 553 F.2d 903, 909 (5th Cir. 1977), *cert. denied,* 434 U.S. 861, 1009, 98 S.Ct. 189, 719, 54 L.Ed.2d 135 (1978).[73]

■ This does not mean, however, that we look at a defendant's actions in the abstract; as the words "deceit" and "scheme" imply, the government must show, not only that the defendant's actions would have deceived a reasonably prudent person, but also that the defendant had the requisite mens rea. As this court has held, the defendant must have "had a 'conscious knowing intent to defraud.'" *United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir.1980) (quoting *United States v. Kyle,* 257 F.2d 559, 564 (2d Cir.1958), *cert. denied,* 358 U.S. 927, 79 S.Ct. 312, 3 L.Ed.2d 301 (1959)); *see also Blu–J, Inc. v. Kemper C.P.A. Group,* 916 F.2d 637 (11th Cir.1990). This mens rea element dictates, in practice, that the perpetrator of the scheme *anticipate* reliance. A defendant cannot possibly intend to deceive someone if he does not believe that his intended "victim" will act on his deception. Mail and wire fraud, just like common law fraud, thus entail "[a]n intention to induce the [victim] to act or to refrain from action in reliance upon the misrepresentation." *See* Prosser and Keeton on Torts 728 (5th ed. 1984) (reciting the elements of common law fraud).

■ When a private plaintiff relies on a violation of the mail or wire fraud statutes as a predicate act for civil RICO, he faces an additional hurdle before he can obtain recovery: he must show not only that the mail or wire fraud statutes have been violated, but also that he has suffered injury as a result of the violation. Section 1964(c) provides civil remedies to those persons who are injured "by reason of" racketeering activity. As we note above, when the government prosecutes a defendant under the mail and wire fraud statutes, it is not required to show that the intended victim was actually deceived and suffered injury. *See Durland,* 161 U.S. at 313–15, 16 S.Ct. at 511–12; *United States v. Dynalectric Co.,* 859 F.2d 1559, 1576 (11th Cir. 1988). A civil RICO plaintiff must show, however, that he was injured by reason of the defendant's acts of deception. As the Supreme Court stated in *Sedima,* "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." 473 U.S. at 496, 105 S.Ct. at 3285. The Court went on to hold that the plaintiff's damages must "flow from the commission of the predicate acts." *Id.* at 497, 105 S.Ct. at 3285. Section 1964(c), as interpreted by the Supreme Court and lower courts, thus imposes a proximate cause requirement: the plaintiff's injury must have been proximately caused by the commission of the predicate acts. *See Zervas v. Faulkner,* 861 F.2d 823, 834–35 (5th Cir.1988); *Brandenburg v. Seidel,* 859 F.2d 1179, 1189 (4th Cir.1988); *Sperber v. Boesky,* 849 F.2d 60, 64 (2d Cir.1988).

■ There is some question whether this proximate cause requirement limits damages recoverable to those caused directly by the predicate act (e.g., by reliance on fraudulent misrepresentations) or to those caused indirectly by the predicate act (e.g., by purchasing property at a price that has been artificially inflated by a scheme to defraud). *See Zervas,* 861 F.2d at 833; *Boesky,* 849 F.2d at 63–64. *But see Nodine v. Textron, Inc.,* 819 F.2d 347, 349 (1st Cir.1987); *Marshall & Ilsley Trust Co. v. Pate,* 819 F.2d 806, 810 (7th Cir.1987). We have taken the more restrictive view, holding that a plaintiff has standing to sue under section 1964(c) only if his injury flowed directly from the commission of the predicate acts. *See Morast v. Lance,* 807 F.2d 926, 933 (11th Cir.1987). This means that, when the alleged predicate act is mail or wire fraud, the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepre-

---

**73.** A scheme's success, or lack thereof, is relevant, however, to the issue of intent to defraud. *See United States v. Pearlstein,* 576 F.2d 531, 542 (3d Cir.1978); *United States v. Meyer,* 359 F.2d 837, 839–40 (7th Cir.), *cert denied,* 385 U.S. 837, 87 S.Ct. 85, 17 L.Ed.2d 71 (1966).

sentations made in furtherance of that scheme. *See O'Malley v. O'Neill*, 887 F.2d 1557, 1563 & n. 9 (11th Cir.1989) (citing *Blount Fin. Servs. v. Walter E. Heller & Co.*, 819 F.2d 151, 152 (6th Cir.1987)), *cert. denied*, — U.S. ——, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990); *see also Grantham & Mann, Inc. v. American Safety Prods., Inc.*, 831 F.2d 596, 606 (6th Cir.1987). *But see O'Malley*, 887 F.2d at 1564 (Anderson, J., specially concurring) (disagreeing with the holding of *Morast*). Thus, we must examine the scheme Pelletier alleges and determine whether any evidence supports the allegations that Culpepper devised it, that Zweifel participated in it, and that Pelletier was injured by it.

i.

 Under the mail and wire fraud statutes, a plaintiff only can show a scheme to defraud if he proves that some type of deceptive conduct occurred. Pelletier alleged in his complaints that in furtherance of Culpepper's scheme to fleece investors, Culpepper made false or misleading statements:

(a) In 1983, to Leroy Langston to induce him to sell some of his stock to the Hurst group;

(b) In 1984, to Mr. Pelletier in connection with the sale by the Hurst group to Mr. Pelletier of the stock they had purchased from Mr. Langston;

(c) In 1985, to Mr. Pelletier to induce Mr. Pelletier to sell his stock to Elite Travel, Inc.

Zweifel, while not making the misrepresentations to Pelletier, is alleged to have conspired with Culpepper to perpetrate the scheme.[74]

The crux of the scheme, as alleged by Pelletier, was Culpepper's promise to transfer financial control of House of Travel to Pelletier in order to induce Pelletier to purchase the Hurst Group's stock. Yet Pelletier's allegations of mail and wire fraud based upon this scheme fail for four independent reasons. First, the doctrine of res judicata bars Pelletier's claim that Culpepper induced Pelletier to purchase the Hurst Group's stock by promising to transfer financial control of House of Travel to him. Second, there is no evidence from which a jury could infer that Culpepper devised the scheme to defraud Pelletier as Pelletier describes that scheme. Third, as the district court noted, there is no evidence in the record from which a jury could infer that Zweifel intentionally participated in the scheme—if, in fact, such a scheme actually existed. Finally, even if Zweifel did participate as alleged, a jury could not find that Pelletier was injured by reason of an act committed in furtherance of that scheme.

ii.

 The doctrine of res judicata bars Pelletier from now asserting a mail or

---

**74.** The misrepresentations allegedly made in connection with (1) the Hurst Group's purchase of 40 House of Travel shares from Langston, and (2) Elite's purchase of Pelletier's shares, do not merit extended textual treatment.

With regard to the Langston transaction, even assuming that Culpepper misrepresented his intent to turn over his stock to the Hurst Group, Pelletier makes no allegation that Zweifel conspired with Culpepper prior either to the communication of the misrepresentation or the sale. Even if he had, however, Pelletier suffered no injury as a result of that misrepresentation. Civil RICO requires a showing of injury; and this is fatal to Pelletier's claim. (Nor can Pelletier plead this misrepresentation solely to establish a *pattern* of predicate acts since Pelletier makes no allegation that Zweifel counseled Culpepper to make it.)

Pelletier also alleges that Culpepper induced him to sell his House of Travel shares to Elite.

Again, however, there is no competent evidence of Zweifel's involvement in this scheme. In fact, the Elite transaction was completely contrary to Zweifel's and Lokey & Bowden's interest. The Elite transaction included a proposed assignment to Pelletier of the right to litigate House of Travel's claims against Zweifel and Lokey & Bowden and a method of dividing the recovery from the suit if it was successful. Thus, in essence, Pelletier alleges that Zweifel conspired to sue himself. We cannot infer that Zweifel participated in the scheme on these facts.

Thus, the only claim that potentially caused Pelletier injury is the one grounded on Culpepper's misrepresentation of his intent to hand over managerial control of House of Travel to Pelletier, which allegedly induced Pelletier to purchase the Hurst Group's stock.

wire fraud claim based upon the sale of the Hurst Group's stock. Res judicata actually encompasses two different preclusion doctrines: claim preclusion and issue preclusion. Claim preclusion bars the litigation of matters that could have been litigated in an earlier suit, but were not. Issue preclusion, on the other hand, bars the relitigation of matters that were actually litigated and decided in a prior suit. *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984). The preclusive effect of a dismissal with prejudice, an unlitigated matter, thus is examined under the requirements for claim preclusion. Since such a judgment is unaccompanied by findings, it does not, however, collaterally estop the plaintiff from raising issues that might have been litigated if the case had proceeded to trial. *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 327, 75 S.Ct. 865, 868, 99 L.Ed. 1122 (1955).

 Claim preclusion bars a plaintiff from bringing a subsequent lawsuit when four requirements are met: "(1) there must be a final judgment on the merits, (2) the decision must be rendered by a court of competent jurisdiction, (3) the parties, or those in privity with them, must be identical in both suits; and (4) the same cause of action must be involved in both cases." *I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1549 (11th Cir.1986). On January 16, 1985, Pelletier and Langston sued House of Travel, Culpepper, and the Hursts in state court seeking damages for breach of contract and fraud based on Culpepper's promise to transfer financial control of House of Travel to Pelletier ("the shareholders' derivative suit"), *see supra* p. 1478. In that suit, Pelletier alleged that Culpepper breached his oral promise to Pelletier, made prior to Pelletier's December 29, 1984 acquisition of the Hurst Group's stock, to transfer to Pelletier "complete financial control" of House of Travel and "supervisory responsibility" over its employees. In addition, Pelletier alleged that Culpepper never intended to perform the oral promise and thereby fraudulently induced Pelletier to purchase the Hurst Group's stock. Pelletier dismissed this suit

with prejudice on May 4, 1985, as part of Elite's purchase of his House of Travel stock. After examining the allegations in the shareholders' derivative suit, we find that Pelletier now alleges essentially the same cause of action; further, since the resolution of the first suit satisfies the four requirements of res judicata, the present claim is barred.

 The first two requirements, that there be (1) a final judgment on the merits (2) rendered by a court of competent jurisdiction, are satisfied easily. The law is clear that if a suit has been dismissed with prejudice pursuant to settlement, this is a final judgment that will ground a procedural bar. *Lawlor*, 349 U.S. at 327, 75 S.Ct. at 868; *United States v. Parker*, 120 U.S. 89, 95, 7 S.Ct. 454, 458, 30 L.Ed. 601 (1887); *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1501–02 (11th Cir.1990). Equally settled is the proposition that federal courts will recognize the res judicata effects of a state court judgment. The full faith and credit statute, 28 U.S.C. § 1738 (1988), provides that the judicial proceedings of any state shall have full faith and credit "in every court within the United States." This language requires all federal courts to give preclusive effect to state court judgments "whenever the courts of the State from which the judgments emerged would do so." *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308 (1980); *see also University of Tenn. v. Elliott*, 478 U.S. 788, 794, 106 S.Ct. 3220, 3224, 92 L.Ed.2d 635 (1986). In this case, the state court jurisdiction over the proceedings cannot be challenged, nor can the parties deny its preclusive effect in Georgia courts. Thus, the dismissal was rendered by a court of competent jurisdiction and is binding on this court if the parties are in privity and the cause of action is the same in both proceedings.

Although Zweifel was not a party in the shareholders' derivative suit, Zweifel and Culpepper's relationship, as described by Pelletier, is one of privity. Pelletier alleges that Zweifel conspired with Culpepper to defraud Pelletier. He does not allege, however, that Zweifel himself devised the

scheme or that Zweifel himself made any misrepresentations prior to his December 29, 1984 purchase of the Hurst Group's stock.[75] Pelletier only alleges that Zweifel conspired with Culpepper to induce Culpepper to act. Zweifel's liability is grounded on Culpepper's execution of the conspiracy as Zweifel's agent: the liability is derivative.

In *Citibank, N.A.*, 904 F.2d at 1502–03, this court held that an order of dismissal with prejudice in favor of an agent bars a second suit against the principal on the same cause of action. In that case, Data Lease claimed that Citibank was vicariously liable for the misdeeds of seven of its agents. Prior to this lawsuit, Data Lease had settled with the agents and an order had been entered dismissing with prejudice the claims against them.

Courts, we held, must distinguish situations in which a person suffers injury as the result of the concurrent or consecutive acts of two or more persons from situations in which the defendant's responsibility is derivative or secondary. Where there are concurrent or consecutive acts, subsequent suits may be brought against the tortfeasor.

> Where, [however,] ... the relations between two parties are analogous to that of principal and agent, the rule is that a judgment in favor of either, in an action brought by a third party, rendered upon a ground equally applicable to both, is to be accepted as conclusive against the plaintiff's right of action against the other.

*Id.* (quoting *Spector v. El Ranco, Inc.*, 263 F.2d 143, 145 (9th Cir.1959)). Applying this rule to our case, the agency relationship between Zweifel and Culpepper, *as alleged by Pelletier*, sufficiently establishes privity.

Finally, we hold that this suit involves the same cause of action as the shareholders' derivative action. For the purposes of claim preclusion, a court asks whether the plaintiff in the present suit is proceeding on the same cause of action as in the previous suit. " '[I]f a case arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action, [then] the two cases are really the same "claim" or "cause of action" for purposes of res judicata.' " *Id.* (quoting *Ruple v. City of Vermillion*, 714 F.2d 860, 861 (8th Cir.1983), *cert. denied*, 465 U.S. 1029, 104 S.Ct. 1290, 79 L.Ed.2d 692 (1984)); *see also Wallis v. Justice Oaks II, Ltd.*, 898 F.2d 1544, 1551 (11th Cir.) ("Claims are part of the same cause of action when they arise out of the same transaction or series of transactions."), *cert. denied*, ─── U.S. ───, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990). Here the causes of action are sufficiently similar to bar Pelletier's new claims. In both suits, Pelletier alleged that Culpepper agreed to transfer some financial control to him in exchange for his purchase of the Hurst Group's shares and that Culpepper never intended to perform his promise. The nucleus of operative facts is the same; the substance of the actions is the same, *see I.A. Durbin*, 793 F.2d at 1549 ("The principal test for determining whether the causes of action are the same is whether the primary right and duty are the same in each case. In determining whether the causes of action are the same, a court must compare the substance of the actions, not their form." (citations and footnote omitted)). Accordingly, all four requirements of res judicata are met, and the predicate acts in Pelletier's RICO count based on his claim that Zweifel and Culpepper fraudulently induced him to purchase the Hurst Group's stock are foreclosed.

iii.

■ To succeed in proving that Zweifel committed the predicate acts of mail or wire fraud, Pelletier must show that Zweifel participated in a scheme to defraud

---

**75.** Zweifel's first contact with Pelletier was at the January 8, 1985 meeting in which Pelletier and Conner presented Culpepper with the draft management agreement. Any statements Zweifel made on January 8 could not have injured Pelletier by inducing him to invest in House of Travel since, according to Pelletier's own allegations, his purchase of the Hurst Group stock was complete on December 29, 1984.

Pelletier. Since Pelletier does not claim, however, that Zweifel misrepresented anything to him, but rather that Zweifel conspired in a scheme that Culpepper implemented, Pelletier first must show that Culpepper committed mail and wire fraud and, second, that Zweifel conspired with Culpepper. He can show neither. To demonstrate that Culpepper violated the mail or wire fraud statutes, Pelletier must show that Culpepper had a conscious, knowing intent to defraud and that a reasonably prudent person would have been deceived by Culpepper's misrepresentations. Yet he only can show this if Culpepper *believed* that Pelletier would rely on his promises; otherwise, his claims of fraud will fail.

■ Pelletier asserts that, in December 1984, he and Culpepper reached an oral understanding on the division of managerial powers and that, relying on that understanding, he purchased the Hurst Group's stock. Even assuming this is true, Pelletier's secretly harbored intention to rely on the oral agreement is not evidence that Culpepper *knew* what Pelletier intended to do. While mail and wire fraud offenses are complete even before the targeted victim relies on the scheme and is defrauded by it, *Durland*, 161 U.S. at 313–15, 16 S.Ct. at 511–12, the mens rea element of the offense requires that the perpetrator of the scheme anticipate reliance. If Culpepper never believed that Pelletier would purchase stock on the basis of Culpepper's oral promise, Culpepper lacked the requisite criminal intent for the predicate acts of mail or wire fraud. After reviewing the evidence, we conclude that this is the case: Pelletier convinced Culpepper that only Culpepper's signature on a contract would trigger Pelletier's purchase of the Hurst Group's stock. Zweifel, therefore, could not have participated in a scheme to defraud—there simply was no scheme.

On January 8, 1985, Pelletier presented a draft agreement—that his lawyer, Conner, had prepared—to Culpepper and Zweifel. The draft unequivocally stated that Pelletier had not yet finalized his purchase of the Hurst Group's stock and that "[p]rior to consummating [that] acquisition ..., it

[was] necessary for Pelletier to enter into [the management agreement] with Culpepper." This language clearly indicates that, throughout the course of their negotiations, the parties considered a written management agreement to be a condition precedent to the stock purchase. Even if Culpepper suggested to Pelletier that he would sign a management agreement when one was drafted, he still could not have expected Pelletier to act on that promise alone. At most, Culpepper would have expected Pelletier to expend time and money drafting a contract and negotiating the remainder of its terms. He could not expect Pelletier to buy the Hurst Group's stock. Culpepper simply acted on Pelletier's own representations: he had to sign the agreement before Pelletier would purchase the stock.

■ Culpepper's lack of criminal intent is further demonstrated by the nature of the agreement that Pelletier alleges he and Culpepper reached. Despite Pelletier's protestations to the contrary, he and Culpepper never concluded an enforceable oral management agreement. Under Georgia law, no contract exists unless the parties agree on all of its material terms and conditions and nothing is left to future agreement. *See, e.g., American Viking Contractors, Inc. v. Scribner Equip. Co.*, 745 F.2d 1365, 1369–70 (11th Cir.1984); *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1518 (11th Cir.1989). "[A] contract to enter into a contract in the future is a nullity." *American Viking*, 745 F.2d at 1370.

Pelletier claims that he and Culpepper reached an understanding that Pelletier would obtain working capital for House of Travel and that Culpepper would yield some of his authority to Pelletier. The agreement Pelletier presented to Culpepper on January 8 made, however, no mention of the type or amount of investment Pelletier would make in House of Travel; it merely provided that Pelletier would become a House of Travel shareholder by acquiring the Hurst Group's stock. While Culpepper testified that he wanted to eliminate the Hurst Group from House of Travel, Pelleti-

er's and Culpepper's understanding contemplated, as Pelletier admitted, that Pelletier would provide working capital for House of Travel—not merely purchase a third party's interest in the company. Thus, even accepting Pelletier's allegations as to the terms of the agreement, the material provisions of that agreement were indeterminate. In such a case, a court cannot speculate what terms the parties would have agreed to if they had continued their negotiations; we, for example, do not know exactly how much working capital Culpepper would have asked Pelletier to provide for House of Travel before agreeing to yield his management powers.

Although we are not called upon now to enforce the alleged agreement, we feel that the status of the agreement along with the sophistication of the parties (as we note *supra*, Pelletier is a lawyer) indicates that Culpepper never intended to induce Pelletier to act. Pelletier and Culpepper, as experienced businessmen, must have realized that any oral promises made during the course of the negotiations were unenforceable. Yet Pelletier asks us to infer, on his allegation alone, that Culpepper used such a promise to induce him to purchase the Hurst Group's stock. We cannot make this inference. The only competent evidence before us shows that Culpepper believed that negotiations would continue, and that if the final draft agreement prepared by Conner was suitable, he would sign it. If it was not suitable, then he and Pelletier would go back to the drawing board.

The court's task on a motion for summary judgment is to determine whether a genuine issue of material fact exists. Fed. R.Civ.P. 56(c). Whether Culpepper had devised a scheme to defraud Pelletier is certainly a material fact, but it is a fact that Pelletier would have the burden of proving at trial. When a nonmoving party has failed, after reasonable discovery, to proffer any *competent* evidence to prove an essential element of his case, then no genuine issue exists, and the moving party is entitled to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986);

*Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1196 (5th Cir.1986); 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2727, at 130 (2d ed. 1983). Pelletier has failed to produce any evidence that would suggest that Culpepper devised a scheme to induce Pelletier to buy the Hurst Group's stock; in fact, the evidence indicates that Culpepper believed that he acted in a way that should have prevented Pelletier from buying that stock. Because Pelletier has failed to produce evidence of a scheme to defraud, Zweifel is entitled to summary judgment with regard to the allegations of mail and wire fraud.

iv.

■ Assuming that Culpepper had devised a scheme to induce Pelletier to buy the Hurst Group's stock, Pelletier can implicate Zweifel in the executed scheme by showing Zweifel's intentional participation in the scheme, i.e., that Zweifel "had a 'conscious knowing intent to defraud,'" *Kreimer*, 609 F.2d at 128 (quoting *United States v. Kyle*, 257 F.2d 559, 564 (2d Cir. 1958), *cert. denied*, 358 U.S. 927, 79 S.Ct. 312, 3 L.Ed.2d 301 (1959)), or that he counseled Culpepper to make false representations with knowledge or reckless disregard of their falsity, *see United States v. Sawyer*, 799 F.2d 1494, 1502 (11th Cir.1986), *cert. denied*, 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987). Pelletier does not offer any direct evidence of Zweifel's intent to participate in this scheme; rather, he asks us to hold that a jury could infer such an intent from circumstantial evidence. After reviewing the extensive record in this case, we hold that, even viewing the record in the light most favorable to Pelletier, he cannot show intentional participation.

We have great difficulty in squaring Zweifel's alleged conduct throughout the transaction and ensuing litigation with an intent to participate in the scheme as described by Pelletier. For example, the record discloses that Zweifel did not know prior to the January 8 meeting in Conner's office that Pelletier already had purchased

the Hurst Group's stock.[76] Thus, if Zweifel had been participating in any scheme to defraud Pelletier, he would not have known that he had already accomplished his goal; his conduct presumably still would indicate an intent to defraud Pelletier. Yet why would he tell Conner, *prior to the meeting*, that Culpepper "should not enter into [the Culpepper/Pelletier] Agreement because there is no consideration for it?" And why would Zweifel bring the January 8 meeting to a close if Pelletier and Conner had created the impression that Pelletier had not yet purchased the Hurst stock? Even before Pelletier (through Conner, on January 9, 1985) informed Zweifel of his investment in the company, Zweifel had decided that Culpepper should not sign the agreement. Such conduct is inherently inconsistent with an intent to induce Pelletier to invest in House of Travel.

Furthermore, Pelletier alleges that part of the overall scheme included attempts "to convince the investors to sell their shares to another investor at a relatively low price so that this new investor might bring new capital and sources of credit to the corporation." If so, why would Zweifel refuse to issue a stock certificate to Pelletier? Without that certificate, Pelletier could not sell his shares to a new investor. Pelletier, prior to the January 8 meeting, had guaranteed one of House of Travel's lines of credit, but obviously he was not about to guarantee any other obligations without the stock certificate. Therefore, Zweifel's refusal to issue a new certificate to Pelletier prevented him from selling to a new investor and discouraged him from obtaining any more working capital for the company. And why would Zweifel discourage any potential investors from purchasing Pelletier's share? If Pelletier was no longer House of Travel's "sugar daddy," then it seems that Zweifel should have been en-

---

**76.** There is some evidence to suggest that Pelletier told Culpepper and Zweifel on January 8 that he had acquired an interest in the Hurst Group's stock. Pelletier testified on deposition as follows:

> I made it clear that I had some sort of arrangement with the Hurst[ ]s. Just how clear, I don't remember. I believe at that time and prior to that time, and given the nature of the controversy between the Hurst[s] and [Culpepper] and a lot of allegations flowing from both parties, that I had perhaps made a business decision not to specifically get into detail the transaction with the Hurst[ ]s.
> . . . .
> [M]y introductory comments at the beginning of that meeting [made it] clear that I had become a stockholder in ... House of Travel, and someone could be confused, I assume, whether I was a beneficial holder of stock or whether—the two of them would have enough knowledge to know I was not an owner of record since they controlled the records. I would say you could characterize a business decision that I had made not to give up all the cards. I think as a businessman, given the speculative nature of a lot of charges that were going back and forth, *that I didn't think that that was a good business decision to give up, you know, to hand everybody a copy of my agreement with the Hurst[s].*

(Emphasis added.) Conner also testified that the Hurst affidavit requesting House of Travel to issue a new certificate to Pelletier might have been shown to Culpepper and Zweifel. Conner, however, did not give the affidavit to Zweifel or Culpepper; rather, he kept it in his file.

Only the most vague statements were made regarding whatever agreement Pelletier had with the Hurst Group. No one ever attempted to contradict the language in the draft presented on January 8 to the effect that the signing of that agreement was a *condition precedent* to the consummation of a stock purchase agreement with the Hurst Group. Therefore, at most, Pelletier and Conner told Zweifel and Culpepper on January 8 that Pelletier had entered into an agreement with the Hurst Group that was not yet finalized and that was subject to a condition precedent—the signing of the agreement with Culpepper.

What appears to be more likely is that Pelletier and Conner wanted to trick Culpepper into signing the agreement on January 8 by convincing him that his signature was necessary to rid himself of the Hurst Group and to acquire more operating capital for the company. Indeed, the Georgia Court of Appeals, in the state court action against Zweifel and Lokey & Bowden, *see supra* note 21, states that "[Pelletier] testified that [in making his presentation to Culpepper and Zweifel at Conner's law office on January 8, 1985,] he wished Culpepper to believe that he had not yet consummated the transaction with the Hurst group but to believe that he was still negotiating with that group of shareholders as well as Culpepper." *Lokey & Bowden*, 385 S.E.2d at 91. To decide this appeal, however, we need not, and do not, decide the question concerning Pelletier's and Conner's intent on January 8.

couraging other investors to buy out Pelletier.

Zweifel's actions in the bankruptcy proceedings bolster his claim that he acted in good faith. If the purpose of the continuing scheme, in part, was "[t]o enable ... Zweifel to obtain money and property for himself [and] for Lokey & Bowden," then Zweifel would not have counseled Culpepper to file a chapter 11 petition. Chapter 11 merely protected the company (and the shareholders' investment) from its creditors while the company reorganized. But Zweifel and Lokey & Bowden were *creditors* of House of Travel. Zweifel might have hoped that his firm would be paid before the petition was filed, but he knew that no such payment had been made and nevertheless counseled Culpepper to file the petition. In essence, then, Zweifel counseled Culpepper to do something that would protect Pelletier's investment from Lokey & Bowden's claim.

■ We could go on but choose not to do so. Assuming that Culpepper had devised a scheme as described by Pelletier, the evidence clearly shows that Zweifel was doing everything possible to ensure its failure. As we note above, a scheme need not be successful to constitute a violation of the mail and wire fraud statutes. *See Durland*, 161 U.S. at 313–15, 16 S.Ct. at 511–12. However, we are equally aware that a scheme's success, or lack thereof, is relevant to the issue of intent to defraud. *See United States v. Pearlstein*, 576 F.2d 531, 542 (3d Cir.1978); *United States v. Meyer*, 359 F.2d 837, 839–40 (7th Cir.1966). Furthermore, this is not a case in which the defendant attempted to defraud someone but failed; rather, this is a case in which

the defendant engaged in conduct that was inherently inconsistent with the goals of the alleged scheme.

Whether Zweifel intended to participate in the alleged scheme is certainly a material fact, but it is a fact that Pelletier would have the burden of proving at trial. *See Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554; *Fontenot*, 780 F.2d at 1196. Pelletier has failed to adduce any evidence to support his contention that Zweifel intended to participate in the scheme; indeed, Pelletier has alleged conduct on Zweifel's part that proves conclusively that Zweifel did not intend to participate in the scheme described by Pelletier. "[I]t is quite clear what the truth is" in this case, *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944); we therefore agree with the district court that Zweifel did not commit the predicate acts of mail and wire fraud.

v.

■ Pelletier's RICO claim based on the mail and wire fraud predicate acts, however, suffers from a more fundamental and glaring defect. As we note above, section 1964(c) provides civil remedies to those persons who are injured "by reason of" racketeering activity. Pelletier's evidence, however, clearly demonstrates that, even if Zweifel did intentionally participate in a mail or wire fraud scheme, Pelletier was *not* injured by reason of that scheme.[77]

Pelletier has alleged that he *was* the target of the Culpepper/Zweifel scheme and did rely to his detriment on various misrepresentations made in furtherance of that scheme. Therefore, Pelletier's *allega-*

---

77. Probably the most obvious defect is Pelletier's allegation that he lost his investment in House of Travel by reason of Zweifel's conduct. We know now that this cannot be true. The Georgia Court of Appeals, as we note above, *see supra* p. 1495, has held that Pelletier never purchased House of Travel stock because the Hurst Group had already sold its stock to TI. Clearly, Pelletier lost his $150,000 investment in House of Travel because he bought something that did not exist. The Georgia court, however, did not hand down this decision until June 1989—almost one year after the district court granted Zweifel's motion for summary judgment. Since

we are concerned not only with the district court's order granting summary judgment, but also with Zweifel's motion for sanctions under Rule 11, we will assume for the sake of that discussion that Pelletier reasonably believed that he was buying House of Travel stock in December 1984. We will also assume that Pelletier reasonably believed, when he filed his complaint with the district court in January 1986, that he had purchased House of Travel stock. We do so simply to show that, even if Pelletier had actually purchased House of Travel stock, his complaint was frivolous when filed.

*tions,* if true, are sufficient to meet section 1964(c)'s requirement of injury, and normally we would accept those allegations as true. But, as we note above, when a plaintiff, on summary judgment, provides *only* bald allegations concerning an essential element of his case with no competent evidence to support those allegations, and when the plaintiff's evidence conclusively proves the opposite of his allegations, summary judgment in the defendant's favor is appropriate. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2548; *Fontenot,* 780 F.2d at 1196. Indeed, Pelletier's evidence does prove the opposite of what he has alleged.

At the heart of Pelletier's case is his allegation that he relied on Culpepper's promise to transfer certain financial and managerial controls to Pelletier: according to Pelletier, he would not have purchased the Hurst Group's stock "without such promises and guarantees." Pelletier alleges that Zweifel counseled Culpepper to make such a promise. Furthermore, he alleges that he would not have purchased the stock had he known the extent of the Hurst Group's misappropriation of funds from the company—a fact well known by Zweifel at the time Pelletier purchased the stock. On their face, these allegations seem reasonable and, if true, would likely satisfy section 1964(c)'s proximate cause requirement. Unfortunately for Pelletier, they are not true.

Consider the first allegation. According to Pelletier, Culpepper verbally promised, in mid-December of 1984, to give up certain powers as president of the company and transfer those powers to Pelletier for Pelletier's promise to obtain working capital for the company after he had purchased the Hurst Group's stock. For example, the agreement allegedly contemplated limiting Culpepper's authority to incur any liability to the amount of $2000 and that Pelletier would have sole authority to authorize expenditures in excess of $2000. Furthermore, Culpepper would give up most of his authority to hire personnel and transfer that authority to Pelletier and the board of directors. And, Culpepper purportedly agreed to transfer all authority over day-to-day operations to a vice president in charge of operations. Pelletier alleges that without these promises from Culpepper, he would not have purchased the Hurst stock.

We are troubled by this allegation. In deposition, Pelletier gave the following testimony, which we quote at some length:

[During the December 29 meeting with the Hurst Group, when the stock purchase agreement was signed, the Hursts made] a lot of derogatory comments about Culpepper.... It was ... enough to raise some concerns on my part as to whether Culpepper could be trusted.... [Conner] and I had an opportunity during the course of that day to have discussions. One of [the concerns] that [Conner] raised and had been raising before this meeting, probably raised even stronger, was that *I might be foolish in thinking that it was going to be so easy to get Culpepper to agree to what he already agreed to; in other words, to get it on paper.* That because of his fear, because of ... Conner['s] fear that we might have difficulty in reducing Culpepper and my agreement to a writing because I think, as I think, I would have had a fear in doing that with the Hurst[ ]s, that certain things should take place.... [I]n the decision between [Conner] and I was that it was the security of knowing that if Culpepper didn't come in and reduce the agreement that he and I had to a writing, that I would be in a very bad position because I would be a 40 percent shareholder versus a 60 percent interest somewhere else, somewhere else being between Culpepper, Langston, and possibly the Hurst[ ]s.... [T]here was a concern that if Culpepper couldn't be trusted, that if he believed that he had ... me over a barrel and knew that he could have been in a position of being still in control of [House of Travel] without dealing with me, that he could do so. Just a thought of maybe we can't trust him, either. Part of that distrust that I believe might be there was the fact that when I met with Culpepper on those two meetings, not only his distrust of the Hurst[ ]s was evident, but it was much more than that. There had

been, from what I understood, some physical contact. People had been pushing each other around, gotten beyond just words. *And it was quite clear that foremost in Mr. Culpepper's mind was to get rid of the Hurst[ ]s.*

(Emphasis added.)

As an experienced attorney and businessman, Pelletier must have realized that his oral understanding with Culpepper was unenforceable. Without further elaboration of Pelletier's obligation to obtain working capital for House of Travel, the negotiations bound neither Pelletier nor Culpepper. Pelletier's actions show that he recognized this. Pelletier testified that he and his attorney inserted certain safety provisions into the stock purchase agreement with the Hurst Group to guard against the possibility that Culpepper would not sign the draft management contract. The first was a litigation agreement. The Hurst Group had filed a state court suit, asking the court to direct Culpepper to tender 40 shares of the company's stock to the Hurst Group in satisfaction of Culpepper's alleged agreement to tender those 40 shares at the same time Leroy Langston tendered 40 of his shares to the Hurst Group. *See supra* at 1471–1472. The litigation agreement provided that the Hurst Group would use its best efforts in pursuing that state court claim and that Pelletier would have the right to choose counsel for the Hurst Group. If the Hurst Group prevailed, the agreement provided that the Hurst Group would convey the stock to Pelletier for the sum of $1000. Thus, if Culpepper refused to sign his agreement with Pelletier, Pelletier felt that he "would have some course of action [he] could take." If the Hurst Group prevailed in its suit, Pelletier would not need the management agreement with Culpepper: he would own 80% of the company's stock and would be in complete control.

As a further precaution, Pelletier and his attorney inserted a provision into the stock purchase agreement dealing with the tender of the Hursts' resignations as directors and officers of the company. Under this provision, the Hursts tendered their resignations to Pelletier when they signed the stock purchase agreement. Pelletier, however, would not deliver the resignations to the corporation until he had reduced his agreement with Culpepper to writing and Culpepper signed it. Presumably, Pelletier intended this provision to keep the Hursts, who apparently were on Pelletier's "side," as directors of the company. Otherwise, if the Hursts resigned *and* Culpepper refused to sign the agreement, Culpepper would be the only director remaining, and Pelletier would have no receptive ear in the company's management. According to Pelletier, because he had "a concern that maybe [he] could not trust Culpepper and ... was making a substantial financial investment[,] ... certain protections were needed."

The point of this discussion should be clear by now. Pelletier went into this transaction with his eyes wide open: he took a chance that did not pay off. He testified that he "cut a lot of corners to do the deal.... [He] had a certain fear that th[e] opportunity was going to escape if [he] didn't move on it quickly." He had a real fear that Culpepper would not reduce his agreement to writing, so he structured the stock purchase agreement with the Hurst Group accordingly. Pelletier alleges that the "representations that Mr. Pelletier would be placed in financial control of ... House of Travel ..., and that certain management reforms and controls would be put in place were material to the transaction, in that Mr. Pelletier would not have made this investment without such promises and guarantees." This simply is not true. Pelletier structured the stock purchase agreement in a way that assumed that Culpepper might not come through. Pelletier, by his own admission, did not rely on Culpepper's promises: although he thought that Culpepper would have good reason to sign the agreement, he acted as though Culpepper would not treat the prior verbal agreement as binding.

As one noted authority has said:
Unless an untrue statement is believed and acted upon, it can occasion no legal injury. It is essential, therefore, that the party addressed should trust the repre-

sentation, and be so thoroughly induced by it that, judging from the ordinary experience of mankind, in the absence of it he would not, in all reasonable probability, have entered into the contract or other transaction.

2 J. Pomeroy, A Treatise on Equity Jurisprudence § 890, at 1843 (4th ed. 1918); *see Farrar v. Churchill*, 135 U.S. 609, 616, 10 S.Ct. 771, 773, 34 L.Ed. 246 (1890). The foregoing discussion shows beyond a doubt that Pelletier did not trust Culpepper's representations and did not act as though he trusted Culpepper. He did not rely on the alleged misrepresentations and therefore cannot claim that his injury was proximately caused by Culpepper's fraudulent scheme.

As we note above, Pelletier also alleges that he would not have purchased the Hurst Group's stock if he had known the gravity and extent of the Group's misconduct. According to Pelletier, the members of the Hurst Group misappropriated approximately $180,000 of the company's funds primarily by using the company's money to pay personal expenses. Pelletier alleges that Zweifel was aware of these misappropriations but failed to disclose that fact to Pelletier when he was considering purchasing the Hurst Group's stock. *See United States v. O'Malley*, 707 F.2d 1240, 1247 (11th Cir.1983) (nondisclosure of material fact with intent to create a false or fraudulent representation can constitute scheme to defraud under mail fraud statute).

In essence, Pelletier alleges that he was led to believe that House of Travel was worth one amount, that Zweifel was aware that the company was worth less than that amount (because the Hurst Group had misappropriated funds), and that, had Zweifel conveyed his information to Pelletier, Pelletier would not have purchased the stock. Pelletier's own testimony, however, conclusively contradicts this allegation. Pelletier testified that he estimated the value of the Hurst Group's shares by reviewing a financial statement Culpepper gave him at one of their mid-December (1984) meetings. The statement contained House of Travel's sales figures (and presumably expense figures as well). Pelletier testified as follows:

I had asked him what his sales were. Other people have [a] different philosophy in the travel agency industry. My feeling is, I want to know what your sales are. *The rest we can handle. I don't care if you're losing money.* If you got the sales, your sales are at a certain point, looking at a number of broad factors, numbers of offices, that type of thing, it can be worked out, but sales are very important.

. . . .

[L]et's go back to [the December 17 meeting with Culpepper]. He raised the indiscretions of the Hurst[ ]s, whatever they were. And, of course, I said to him that, you know, I understand that they, you know, they've raised whatever about you. . . . It didn't really matter to me that, basically, Culpepper and his lawyer had, whatever they had done to these guys to get them to sell for 150, my feeling was that if one set of the parties was removed, that the agency could get back on track, and that was a dynamite moneymaker. . . . There was no question that the Hurst[ ]s were off and running, doing whatever they wanted to do, and that the Culpepper[ ]s were off and running what they were doing, trying to do, and that the Hurst[ ]s had these sales people that were generating these sales, *but God knows what they were doing. . . . Even that was okay,* as long as everything could be defined and everything could be put in its proper structure.

(Emphasis added.)

Obviously, Pelletier based his estimate of the company's value *solely* on the amount of sales it had been generating. He did not care that the owners had been draining funds from the company through the company's expense accounts. But Pelletier has not alleged that Zweifel was aware of information that would call into question the accuracy of the *sales* figures. Instead, Zweifel allegedly was aware of information that would be reflected in the company's expense figures. Pelletier, by his own admission, relied only on the sales figures: he did not rely on any other information the accuracy of which would have been undermined had Zweifel disclosed the amount of

the Hurst Group's misappropriations.[78] Obviously, Zweifel's alleged non-disclosure did not proximately cause Pelletier to invest in the company.

Assuming that Culpepper had devised a fraudulent scheme as described by Pelletier, and assuming Zweifel intentionally participated in that scheme, Pelletier has failed to produce any competent evidence from which we can infer that the alleged misrepresentations and omissions made in furtherance of the scheme proximately caused Pelletier any injury. In fact, Pelletier's own testimony shows conclusively that his injury, if any, was not proximately caused by the misrepresentations and omissions. Whether Pelletier was injured "by reason of" the purported predicate acts of mail and wire fraud is certainly a material fact, but the record discloses no genuine issue that would warrant a trial. We conclude that summary judgment on this issue was appropriate.

c.

■ Pelletier also alleges, as a predicate act, that Zweifel, in connection with the Pelletier/Hurst Group transaction, committed securities fraud in violation of 15 U.S.C. § 78j(b) and Rule 10b–5. To succeed in showing that Zweifel violated these provisions, he must show that Zweifel misstated or failed to disclose a material fact, that Zweifel had an intent to deceive, and that Pelletier reasonably relied on and was injured by the misstatement or omission. *See Ross v. Bank South, N.A.*, 885 F.2d 723, 728 (11th Cir.1989) (en banc), *cert. denied,* —— U.S. ——, 110 S.Ct. 1924, 109 L.Ed.2d 287 (1990); *id.* at 738–39 (Tjoflat, J., specially concurring) (reliance must be reasonable). Pelletier relies on the same conduct to support his securities fraud allegation as he uses to support his mail and wire fraud allegations.[79] We will not belabor this issue. For the same reasons as stated in subsection (b) above, Pelletier is barred from asserting a claim based on fraud in his purchase of the Hurst Group's stock, and he has failed to produce any evidence to support an inference that Zweifel intended to deceive Pelletier or that Pelletier relied on the alleged misstatements or omissions.[80]

B.

■ Pelletier contends that the district court erred in summarily disposing of his

78. In fact, Pelletier's argument is logically flawed. Zweifel supposedly was aware of information that would have revealed that the company's expenses had been *overstated.* Without the Hurst Group funneling off money through the company's expense accounts, the company's *real* expenses would have been lower, making House of Travel *a better deal* than would have been indicated by a profit/loss or cash flow statement.

Finally, we note that throughout his deposition, Pelletier testified that he knew of the Hurst Group's misconduct. During one of his mid-December meetings with Culpepper, Culpepper told him that he and his lawyer were threatening to put the Hurst Group "in jail for these indiscretions." Pelletier cannot claim that he would not have purchased the Hurst Group's stock if he had known the extent of the indiscretions: he knew that they were serious enough to warrant criminal penalties. Pelletier's injury was not caused by Zweifel and Culpepper failing to tell Pelletier about the Hurst Group; rather his injury was proximately caused by his own decision to ignore the many warnings he had received about the Hurst Group's conduct. *See Shappirio v. Goldberg*, 192 U.S. 232, 241–42, 24 S.Ct. 259, 261, 48 L.Ed. 419 (1904) (party who has had an opportunity to investigate a representation and discover the truth, or who can be charged with knowledge of the truth, cannot claim that he relied on the representation); 2 J. Pomeroy, A Treatise on Equity Jurisprudence § 893, at 1851 (4th ed. 1918).

79. Pelletier also alleges that Zweifel failed to disclose to him that House of Travel's shares were restricted. Pelletier does not, however, adduce any evidence that Zweifel intended to deceive Pelletier or that, even if he did, Pelletier relied on the omission.

80. Pelletier's securities fraud allegation is defective for another reason. Pelletier's securities fraud allegation requires that he show certain fraudulent conduct in connection with the purchase or sale of securities. In sum, since Pelletier never purchased a security from the Hurst Group, he has no claim under section 78j(b) or Rule 10b–5. The Georgia Court of Appeals has held that Pelletier purchased no securities from the Hurst Group on December 29, 1984. *See Lokey & Bowden v. Pelletier*, 192 Ga.App. 470, 385 S.E.2d 90 (1989). Pelletier concedes that the doctrine of collateral estoppel precludes him from contending in the instant case that he purchased the Hurst Group's stock on that date. He did not make this concession, however, until the oral argument of these appeals, when we

securities fraud claims, counts two and five of his amended complaint. Count two is based on 15 U.S.C. § 78j(b) and Rule 10b–5, and count five is based on Ga.Code Ann. § 10–5–12(a)(2)—Georgia's equivalent of Rule 10b–5. A plaintiff must prove essentially the same elements under the state provision as he must prove under the federal provision. *Cf. Kirk v. First Nat'l Bank,* 439 F.Supp. 1141, 1147–48 (M.D.Ga.1977); *Curtis v. State,* 99 Ga.App. 732, 109 S.E.2d 868, 871–72 (1959). As we discuss above in connection with Pelletier's allegation of securities fraud as a RICO predicate act, *see supra,* Pelletier is barred from asserting a claim based upon his purported purchase of the Hurst Group's stock and he has failed to produce any evidence from which we could infer that Zweifel intended to deceive Pelletier or that Pelletier relied on Zweifel's purported misrepresentations or omissions. Furthermore, the Georgia Court of Appeals' holding that Pelletier never purchased any House of Travel stock, which Pelletier concedes has estoppel effect, *see supra* note 80, disposes of these claims as well. Summary judgment in favor of Zweifel on the securities fraud claims is therefore appropriate.

### C.

To summarize, the district court's order granting summary judgment in favor of Zweifel on the count one RICO claims should be affirmed: Pelletier has failed to produce any evidence that Culpepper or Zweifel had devised a scheme to defraud

Pelletier, that Zweifel knowingly participated in a mail, wire, or securities fraud scheme, or that Pelletier was injured by reason of any of the alleged predicate acts. For the same reasons, we affirm the district court's grant of summary judgment on the remaining federal and state securities fraud claims.

### III.

Pelletier also challenges the district court's order dismissing, under Fed.R. Civ.P. 12(b)(6), his claims that Zweifel made false statements in violation of Ga.Code Ann. § 16–10–20 (count seven), committed state law barratry (count six), and violated the state RICO provision (count eight).[81] We conclude that the district court properly dismissed each of these claims.

### A.

Section 16–10–20 of the Georgia Code prohibits the making of false statements in any matter "within the jurisdiction of any department or agency of state government or the government of any . . . political subdivision of [the] state." Ga.Code Ann. § 16–10–20 (1988). To prevail on this count, Pelletier must show that (1) Zweifel violated the false statements statute; (2) the statute creates a civil cause of action; and (3) the violation of the statute injured him. Pelletier's allegations are not sufficient to satisfy these requirements.[82]

---

asked Schlanger whether such a concession would be in order.

Putting this collateral estoppel issue aside, we do recognize that the standing requirements of the securities laws, *see Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (imposing purchaser-seller limitation on Rule 10b–5 private damages actions), do not apply to civil RICO actions based upon predicate acts of securities fraud—the plaintiff only must show that he was injured "by reason of" the violation, *see Securities Investor Protection Corp. v. Vigman,* 908 F.2d 1461, 1466–67 (9th Cir.1990) (purchaser or seller standing limitation that applies to Rule 10b–5 actions does not apply to civil RICO claims based upon predicate acts of securities fraud)—the predicate acts must actually occur. Thus, *someone,* even if not the civil RICO plaintiff, must have been a purchaser or seller of securi-

ties. Pelletier does not claim, however, that any other person purchased or sold securities in connection with Culpepper's representation to him. He claims only that he was personally defrauded; and for this claim to succeed, he actually must have purchased the Hurst Group's stock.

**81.** Pelletier, in his brief on appeal, does not challenge the dismissal of his federal securities fraud claims in counts three and four of his amended complaint.

**82.** Count seven of Pelletier's complaint states:

The actions of Mr. Zweifel and those acting in concert with him described in this complaint constitute a violation of the provisions of [the Georgia false statements statute, Ga. Code Ann.] § 16–10–20.

For Pelletier, the most difficult aspect of showing a violation of section 16–10–20 is not proving that Culpepper or Zweifel made misrepresentations—we assume for Rule 12(b)(6) purposes that these allegations are true—but rather that the misrepresentations occurred within the jurisdiction of a government agency. We have sifted through Pelletier's lengthy amended complaint, but only uncover allegations that Culpepper, counseled by Zweifel, misrepresented facts to state and federal court officials and to Pelletier. None of the alleged statements implicated the jurisdiction of a department or agency of the state. Consequently, Pelletier cannot claim that Zweifel's or Culpepper's misrepresentations violated the false statement statute.[83]

While we could end our discussion here, we give Pelletier every possible benefit of the doubt and show that, even with a liberal reading of his complaint and a favorable construction of the law, he cannot state a claim. If we assume, for example, that Pelletier intended to invoke the broader jurisdictional reach of section 16–10–71 of the Georgia Code, the false swearing statute, Pelletier's claim still must fail. Pelletier cites a Georgia Court of Appeals decision, *Peters v. Imperial Cabinet Co.*, 189 Ga.App. 337, 375 S.E.2d 635, 636 (1988), which recognizes a private cause of action under the false swearing statute in conjunction with a provision of the Georgia tort code that creates a cause of action "[w]hen the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another," Ga.Code Ann. § 51–1–6 (1982).

Pelletier's complaints (the original and the amended complaint) mention two possible types of misrepresentations: those that were made in a judicial proceeding and those that were made outside a judicial proceeding. Action on either type of misrepresentation is precluded. *Peters* itself expressly forestalls an action for false swearing that occurs during a judicial proceeding. *Peters*, 375 S.E.2d at 636; *see also Commercial Plastics & Supply Corp. v. Molen*, 182 Ga.App. 202, 355 S.E.2d 86 (1987); *Sun v. Bush*, 179 Ga.App. 140, 345 S.E.2d 873, 874 (1986). And the only possible evidence of false swearing outside a judicial proceeding that we can discern is the affidavit of September 18, 1984, in which Culpepper stated that he had secretly arranged with the Hurst Group not to transfer his House of Travel shares to it, thereby inducing Langston to sell.[84] While a civil cause of action might lie for this misrepresentation, Pelletier does not claim that Zweifel knew that Culpepper's representation was false or that he suffered any injury as a result of it—nor, in our opinion, could he.

**B.**

Pelletier also alleges that Culpepper and Zweifel, acting in concert, violated the Georgia barratry statute, Ga.Code Ann. § 16–10–95. This court is left again to its own devices to substantiate Pelletier's allegations.[85] We assume that Pelletier refers to Culpepper's chapter 11 petition on behalf of House of Travel which was filed after voided Culpepper's stock certificate and prepared two new stock certificates: one in the name of William Charles Hurst for 40 shares and one in the name of Culpepper for 10 shares. To induce the secretary to void the new certificates and prepare a new certificate for Culpepper, evidencing his ownership of 50 shares, Culpepper signed an affidavit in which he acknowledged the existence of this secret agreement.

---

**83.** Even if Pelletier could meet the jurisdictional requirements of this statute, we share the district court's conclusion that it does not create a civil cause of action. Section 51–1–6 of the Georgia Code provides a cause of action for violations of statutes that are intended to benefit the party bringing the suit. The false statement statute was enacted, however, for the protection of the state itself—not private parties. Moreover, as noted *infra*, no private cause of action lies for false statements made in judicial proceedings. *Peters v. Imperial Cabinet Co.*, 189 Ga.App. 337, 375 S.E.2d 635, 636 (1988).

**84.** When Culpepper ostensibly sold 80% of his House of Travel stock to the Hurst Group on October 14, 1983, House of Travel's secretary

**85.** Pelletier simply pleads:

The actions of Mr. Zweifel and those acting in concert with him described in this complaint constitute a violation of the provisions of [the Georgia barratry statute, Ga.Code Ann. § 16–10–95].

Zweifel had been discharged as House of Travel's counsel and Culpepper had been discharged as its president.

A person commits barratry when he knowingly and willfully:

(1) Excites and stirs up groundless actions in the courts or quarrels in administrative proceedings;

(2) Institutes or causes to be instituted a legal proceeding without obtaining proper authorization; or

(3) Solicits or encourages the institution of a judicial or administrative proceeding or offers assistance therein before being consulted by a complainant in relation thereto.

Ga.Code Ann. § 16–10–95. The district court held that this section does not create a civil cause of action. Even assuming, however, that Pelletier could invoke section 51–1–6 of the Georgia Code and that this section, by implication, provides a civil action for barratry, a question we decline to decide, and, further, that Zweifel counseled the filing of the petition, Pelletier alleges no injury resulting from the bankruptcy proceedings. As we discuss above, the Hurst Group ratified that filing, and Pelletier expressly consented to the subsequent prosecution of the chapter 11 petition. In addition, Pelletier presents no evidence that the protection offered to an insolvent company under chapter 11 actually harmed Pelletier as a stockholder.

C.

[36] The district court dismissed Pelletier's state RICO claim because his complaint did not allege how the Georgia statute was violated. To state a civil RICO claim a plaintiff must plead that (1) the defendant violated the act and (2) the plaintiff was injured as a result of the violation. Pelletier does not allege, however, that Zweifel committed any of the predicate acts for Georgia RICO.[86] Consequently, his claim must fail. Even if we assume, however, that Pelletier intended to allege the false statements and barratry violations as

predicate acts, Pelletier's state RICO claim also must fail since we conclude that neither of those substantive violations is meritorious.

IV.

A.

We now consider the district court's denial of Zweifel's motion for sanctions pursuant to Rule 11. Rule 11 provides, in relevant part:

The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is *well grounded in fact* and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, *and that it is not interposed for any improper purpose, such as to harass* or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, *shall impose* upon the person who signed it, a represented party, *or both*, an appropriate sanction ....

(Emphasis added.) In denying Zweifel's motion for sanctions, the district court focused on the factual basis of Pelletier's allegation that Zweifel intended to participate in Culpepper's scheme. The court noted that Zweifel, in his motion, did not "specifically point out any allegations in the complaint which are misleading by reason of omission of facts which should have been available to Plaintiff's counsel through reasonable inquiry." Although the court held that Zweifel did not have the requisite intent to participate in the scheme, it could not fault Pelletier "for the fact that Congress enacted legislation which allows [a RICO] claim to be made against an individual who by no stretch of the imagination would be thought of as a

---

86. In count eight, Pelletier pleads:
The actions of Mr. Zweifel and those acting in concert with him described in this complaint

constitute a violation of the provisions of the Georgia RICO Act, [Ga.Code Ann. § 16–14–1 *et seq.* (1988)].

racketeer by any intelligent member of the public."

[37] The Supreme Court has recently held that "an appellate court should apply an abuse-of-discretion standard in reviewing all aspects of a district court's Rule 11 determination." *Cooter & Gell v. Hartmarx Corp.*, — U.S. —, —, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990). Therefore, we may reverse the district court's denial of sanctions only if we find that it abused its discretion. We find such an abuse of discretion in this case.

The Court, in *Cooter & Gell*, held that "[a] district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* The district court below, apparently of the view that its examination of Pelletier's complaint was circumscribed by the allegations in Zweifel's motion for sanctions, limited its inquiry to the merits of Pelletier's allegation that Zweifel intended to participate in Culpepper's scheme. A district court, however, must impose sanctions sua sponte whenever it finds a complaint to be frivolous. The court below operated under

an erroneous view of the law: it should have conducted—on its own initiative—a much more searching inquiry into the merits of Pelletier's complaint. Because it failed to conduct such an inquiry, it developed a clearly erroneous assessment of the evidence.

We next turn to the standard imposed by Rule 11 and show that, as a matter of law, Pelletier and his attorney should be sanctioned for filing and pursuing this action.[87]

### B.

▮▮▮▮ This court has held that three types of conduct warrant the imposition of Rule 11 sanctions: (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) when the party files a pleading in bad faith for an improper purpose. *See United States v. Milam*, 855 F.2d 739, 742 (11th Cir.1988); *Donaldson v. Clark*, 819 F.2d 1551, 1556 (11th Cir.1987) (en banc).[88]

**87.** We need not remand the Rule 11 issues to the district court for further consideration under a proper application of the law. The record before us demonstrates beyond any question that Rule 11 sanctions are in order, what the sanctions should be at a minimum, and that Pelletier and Schlanger should be liable for them jointly and severally.

**88.** Rule 11 imposes a standard of reasonableness under the circumstances. *See* Fed.R.Civ.P. 11 advisory committee note. A court should apply this standard with two goals in mind: to deter the filing of frivolous claims and defenses, *see Thomas v. Evans*, 880 F.2d 1235, 1239 (11th Cir.1989); Schwarzer, Rule 11 Revisited, 101 Harv.L.Rev. 1013, 1020 (1988); Note, A Uniform Approach to Rule 11 Sanctions, 97 Yale L.J. 901, 907 (1988), but not to "chill an attorney's enthusiasm or creativity in pursuing factual or legal theories," Fed.R.Civ.P. 11 advisory committee note.

In assessing Rule 11 sanctions, a court first determines whether the party's claims are objectively frivolous—in view of the facts or law— and then, if they are, whether the person who signed the pleadings should have been aware that they were frivolous, i.e., whether he would have been aware had he made a reasonable inquiry. If the attorney/party did not make a "reasonable inquiry," then the court must im-

pose sanctions—despite the attorney/party's good faith belief that the claims were sound. *See Donaldson*, 819 F.2d at 1556. With regard to the reasonableness of the party's inquiry into the pleading's factual basis, a court may consider whether the signing attorney accepted the case by referral from another member of the bar; the time available for investigation; the extent of the attorney's reliance on his client's version of the facts; the complexity of the facts; and the extent to which factual development requires discovery. *See* Fed.R.Civ.P. 11 advisory committee note; *Thomas v. Capital Sec. Servs.*, 836 F.2d 866, 875 (5th Cir.1988) (en banc); ABA, Section of Litig., Standards and Guidelines for Practice Under Rule 11 of the Federal Rules of Civil Procedure, 121 F.R.D. 101, 114 (1988) [hereinafter ABA Standards]. With regard to the reasonableness of a pleading's legal basis, a court may consider the time available to prepare the pleading; the complexity of the legal issues; the plausibility of the argument; and whether the party is proceeding pro se. *See* Fed.R.Civ.P. 11 advisory committee note; *Capital Security*, 836 F.2d at 875–76; ABA Standards, 121 F.R.D. at 116–17.

Since, however, we find that Pelletier and Schlanger actually knew from the beginning that Pelletier's claims were frivolous but proceeded to prosecute them anyway, it is unnecessary for us to examine what a reasonable inquiry by Schlanger would have revealed.

We conclude that Pelletier's complaint had no reasonable factual basis when pled and that Pelletier and Schlanger knew this. When they decided to pursue this action despite their knowledge that it was frivolous, they acted in bad faith; they simply demanded from Zweifel the redress they had sought and failed to obtain from Culpepper on similar meritless claims.

■ We first recapitulate the evidence indicating that Pelletier's complaint had no adequate factual basis and was filed in bad faith. Where, as here, we have no direct evidence of the party's and counsel's state of mind, we must examine the circumstantial evidence at hand and ask, objectively, whether an ordinary person standing in the party's or counsel's shoes would have prosecuted the claim. *See Evans*, 880 F.2d at 1243; *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831–32 (9th Cir.1986). On the record available to us, we find strong circumstantial evidence that Pelletier and Schlanger brought this RICO suit for an improper purpose.

### 1.

As we have observed, Pelletier's purchase of the Hurst Group's stock is at the heart of this lawsuit: Culpepper, after consulting Zweifel, allegedly induced Pelletier to purchase the Hurst Group's stock by falsely promising to transfer financial and managerial control of House of Travel to him. As we have observed, that promise, if it was made, was unenforceable; Culpepper had no legal obligation to turn over control of House of Travel to Pelletier. Pelletier, who is a lawyer (he had been a member of the Georgia bar for nearly ten years at the time he brought this suit and had established a Georgia bar review course), knew this—that he could not rely upon Culpepper's promise. Pelletier nonetheless took a calculated risk and decided to purchase the Hurst Group's shares; he did so on December 29, 1984—ten days before he presented Culpepper with the draft management agreement he hoped Culpepper would sign.

Pelletier's claim that he relied on Culpepper's promise to turn over control—that he would not have purchased the Hurst Group's stock but for the promise—borders on the preposterous. The plain fact is that he expected Culpepper to renege, and he therefore took several steps to protect himself. First, he kept his purchase secret from Culpepper; this enabled him to tell Culpepper, on January 8, 1985, when they met in Conner's law office to go over the agreement Conner had prepared, that he would not purchase the Hurst Group's stock and obtain the working capital House of Travel needed unless Culpepper kept his promise. In other words, by keeping the Hurst Group transaction secret, he might be able to induce Culpepper to act—instead of the other way around. Second, Pelletier, anticipating that Culpepper would not capitulate, made a side agreement with the Hurst Group; the Hursts would remain on House of Travel's board of directors—as Pelletier's nominees—and would give Pelletier the right to prosecute their state court suit for specific performance against Culpepper. Thus, if Culpepper refused to give in, Pelletier could obtain control over House of Travel's operations if the Hurst Group won the case, i.e., he would acquire (from the Hurst Group) 40 more House of Travel shares, giving him 80% of the company's stock.

When Culpepper subsequently refused to sign the contract Conner had prepared, Pelletier took a new tack in his effort to obtain control of House of Travel's affairs. He would not wait for the Hurst Group's suit for specific performance to run its course; rather, as he wrote to his attorney, Frank Bassett, on January 9, 1985, he would have House of Travel's "lenders place [it] in default" and then have the state court either appoint a receiver to manage the company's affairs or a provisional director who, collaborating with his two nominees, the Hursts, would effectively give him control of the company's board. This pressure, Pelletier thought, would be more than Culpepper could bear; Culpepper would have to give in.

As it turned out, none of Pelletier's strategies bore fruit, and he eventually sold out to Elite, receiving for his shares $50,000

(half in cash and half in the form of a promissory note from Elite, Carson, and Culpepper) and the right to sue Zweifel and Lokey & Bowden, if given leave to do so by the bankruptcy court, on any claims House of Travel might have had against them. To obtain this price for his stock, however, Pelletier had to dismiss, with prejudice, his suits against Culpepper: his (and Langston's) shareholders' derivative suit, and the Hurst Group's suit for specific performance.[89]

The bankruptcy court refused to grant Pelletier permission to sue Zweifel and his law firm; the House of Travel claims Pelletier wanted to bring against them were meritless and, moreover, House of Travel—and thus its general creditors—might suffer heavy sanctions under Rule 11 if Pelletier brought suit. Pelletier, however, was not to be deterred. On January 23, 1986, he sued Zweifel and Lokey & Bowden in state court, claiming that, as House of Travel's counsel, they had breached the fiduciary duties they owed him, as one of the company's shareholders, by preferring Culpepper over him. His claims had no merit, and once the Hurst Group/TI transaction came to light—establishing that Pelletier had never been a House of Travel shareholder and thus could not have been owed any fiduciary duties by the company's attorneys, his claims were summarily rejected. On January 30, 1986, Pelletier brought the suit now before us.

As we have stated, at the heart of Pelletier's complaint is the notion that Culpepper fraudulently induced Pelletier to purchase the Hurst Group's stock by falsely promising to give Pelletier control of House of Travel's affairs. Pelletier can no longer seek recompense from Culpepper, having dismissed his suits against him with prejudice. Instead, he seeks to hold Zweifel liable because he supposedly counseled Culpepper to make the false promise and, then, to renege on it.

When he filed his complaint and, later, his amended complaint, in this case, Pelletier knew that Culpepper had not defrauded him; Culpepper simply refused to sign a contract that Pelletier wanted him to sign. Pelletier also knew that Zweifel had done nothing more than to advise his client not to sign—because the agreement Conner had drafted was one-sided; it provided for no consideration from Pelletier to Culpepper. All that Pelletier had going for him, therefore, was what had been apparent all along—that Zweifel had advised Culpepper not to sign the agreement Pelletier's lawyer had drafted. This fact, quite obviously, was not enough to make out a conspiracy between Culpepper and Zweifel to trick Pelletier into buying the Hurst Group's stock. And unless he could establish such a conspiracy, Pelletier had no hope of proving the RICO claim (count one)[90] and the federal and state law securities fraud claims (counts two through six of his original complaint; counts two through five of his amended complaint) that he had brought against Zweifel. Pelletier also knew that he could not make out a case on any of the other claims he had asserted (counts seven through ten of his original

---

89. Pelletier had a third suit against Culpepper, the federal securities fraud suit he had Schlanger bring (in the name of the Hurst Group) as a strategic ploy on January 16, 1985, the same day Bassett filed Pelletier's (and Langston's) shareholders' derivative action. *See supra* pp. 1479–1480. The district court dismissed this suit without prejudice on September 26, 1985; thus, Pelletier could have refiled it. Culpepper evidently overlooked this fact when, in exchange for his signature on the $25,000 note to Pelletier, he did not require Pelletier to give him a release of the Hurst Group's securities fraud claims in addition to the dismissal of the two suits mentioned in the text.

90. As noted, the only possible support for the RICO claim was Zweifel's allegedly fraudulent conduct in the Pelletier/Hurst Group transaction and in the filing of House of Travel's chapter 11 petition. If there was no fraud in the first transaction, then Pelletier had to rely on the bankruptcy fraud to prove his RICO claim. A single predicate act of bankruptcy fraud, however, as Pelletier well knew, would not be enough to make out a RICO violation; the act of bankruptcy fraud, if it indeed occurred, was an isolated transaction unrelated to any of the other predicate acts alleged in count one. As an isolated, unrelated predicate act, it could not establish the pattern of racketeering activity necessary to prove a RICO claim. *See supra* pp. 1495–1496.

complaint; counts six through eight of the amended complaint).[91]

It is apparent to us that Pelletier brought this suit purely to harass Zweifel and, in the process, to extract a settlement from him. Our conclusion is buttressed by the manner in which Pelletier pled his case

in the district court and briefed it on appeal. Pelletier's complaints, which Schlanger drafted, are rambling recitations (141 numbered paragraphs in the original complaint; 261 in the amended complaint) of House of Travel's history—from the time of its incorporation until its chapter 11 dis-

**91.** As discussed in detail *supra,* each count in Pelletier's original complaint was objectively frivolous when filed. We briefly reiterate the reasons here:

*Counts one and ten.* Federal and state RICO claims under 18 U.S.C. § 1961 *et seq.;* Ga.Code Ann. § 16–14–1. Suffice it to say that the evidence unequivocally shows that Culpepper and Zweifel never devised a scheme to defraud Pelletier and that, even if it were assumed that Culpepper devised such a scheme, Zweifel did not intend to participate in it. Furthermore, the evidence shows that Pelletier, by his own admission, was not injured by the alleged scheme. At the time Pelletier filed his complaint, the law clearly required that a civil RICO plaintiff show that one or more predicate acts, committed as part of a pattern of racketeering activity, caused him some injury.

In addition to the predicate acts set out in the text *supra,* Pelletier alleges that Zweifel held himself out as House of Travel's attorney, when, in fact, he was representing Culpepper personally; that he engaged in discovery abuse while representing House of Travel in the state court litigation; and that on one occasion he spoke abusively to Emily Langston. Certainly, if these allegations are true, Zweifel may have acted unmannerly or committed a breach of professional ethics. Such conduct, however, does not in and of itself give rise to civil RICO liability. These allegations are simply irrelevant.

*Count two.* A federal securities fraud claim based on 15 U.S.C. § 78j(b) and Rule 10b–5. A person violates these provisions only if he has an intent to defraud, deceive, or manipulate. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). As we indicate above, Pelletier's evidence—evidence available to Pelletier and Schlanger at the time they filed the original complaint—clearly shows that Zweifel had no such intent. Moreover, a plaintiff under this section must show that he relied on the misrepresentation or omission and that his injury was proximately caused by the fraud. *Bruschi v. Brown,* 876 F.2d 1526, 1530 (11th Cir.1989). As we discuss at length above, Pelletier has shown that his loss, in fact, was not caused by the alleged misrepresentations or omissions. Finally, Pelletier and Schlanger realized that all of the securities fraud claims (counts two, three, and four) became frivolous when the Georgia Court of Appeals ruled, in June 1989, that no purchase or sale of securities had ever taken place between Pelletier and the Hurst Group. When Schlanger filed his brief on appeal to this court two

months later, however, he continued to prosecute all of the securities fraud claims. He did not, as required by the ABA Model Rules of Professional Conduct, put the court on notice that his client was never a House of Travel shareholder. *See* Rule 3.3 (1989).

We conclude that Pelletier's count two claim had no reasonable basis in fact at the time the original complaint was filed.

*Count three.* A federal securities fraud claim based on 15 U.S.C. §§ 77*l*(1), (2). This provision applies only to persons who offer or sell securities. When Pelletier filed his original complaint, this circuit defined a person who offered or sold a security as one who directly or proximately caused the purchaser to buy the securities. *See Foster v. Jesup & Lamont Sec. Co.,* 759 F.2d 838, 843–44 (11th Cir.1985). As we note in our discussion above, nothing Zweifel or Culpepper did proximately or directly caused Pelletier to purchase the Hurst Group stock. As is evident from our discussion, all of the facts necessary to show the absence of proximate causation were available to Pelletier and Schlanger before they brought this suit. This claim, at the time it was made, had no reasonable basis in either fact or law.

*Count four.* A federal securities fraud claim under 15 U.S.C. § 77q(a). This provision prohibits essentially the same conduct as that prohibited by section 78j(b). Therefore, for the reasons stated with respect to count two above, this claim had no reasonable basis in fact when it was made.

*Count five.* A state securities fraud claim under Ga.Code Ann. § 10–5–12(a)(2) (1989). This provision prohibits the same conduct as that prohibited by section 78j(b). Again, for the reasons stated in our discussion of count two, this claim had no reasonable basis in fact when it was made.

*Count six.* A state law barratry claim under Ga.Code Ann. § 16–10–95 (1988). Even if this section creates a private cause of action, Pelletier could not prove any injury from the violation, as we note in the text *supra.*

*Count seven.* A claim for making false statements in violation of Ga.Code Ann. § 16–10–20 (1988). This provision clearly provides no private right of action for false statements made in judicial proceedings, *see Peters v. Imperial Cabinet Co.,* 375 S.E.2d 635, 636 (Ga.Ct.App.1988), and any false statements made outside of judicial proceedings did not harm Pelletier. Therefore, this claim had no reasonable basis in either fact or law when it was made.

position. They are quintessential "shotgun" pleadings, replete with factual allegations that could not possibly be material to any of the causes of action they assert. Each count incorporates all of these factual allegations and states, further, that it is based on the conduct in the complaint attributable to Zweifel and "those acting in concert with him." Anyone schooled in the law who read these complaints, however, would know that many of the facts alleged could not possibly be material to all of the counts. Consequently, Zweifel and the district court had to sift through the facts presented and decide for themselves which were material to the particular cause of action asserted, a difficult and laborious task indeed.

As we have recounted, Judge Tidwell heard the alternative motions Zweifel addressed to Pelletier's original complaint. At the hearing, he told Schlanger that he was "treading on mighty dangerous grounds" and should acquaint himself with Rule 11. Judge Tidwell, however, did not rule on Zweifel's motions, having decided to recuse himself from the case. Then, before Judge Evans, who took over the case, could rule on the motions, Schlanger filed an amended complaint.

In the amended complaint, Schlanger followed the format he used in drafting the original complaint; that is, he began with a rambling recitation of House of Travel's history and then stated Pelletier's claims for relief—basing them, as before, on all of the facts pled. This time he embellished his factual allegations by incorporating by reference four volumes of evidentiary exhibits (in total, five and one half inches thick).

The task of deciphering Pelletier's amended complaint far exceeded the task of deciphering his original complaint. In his count one RICO claim, Pelletier, as we have previously observed, attempted to assert not one claim but four claims.[92] That is, he sought treble damages under 18 U.S.C. § 1964(c) for Zweifel's alleged violation of all four of RICO's criminal provisions: 18 U.S.C. §§ 1962(a), (b), (c), and (d). *See supra* note 63.[93] Thus, by alleging in count one that Zweifel had violated each of section 1962's subsections, Pelletier was claiming that Zweifel had injured him (1) by investing income derived from a pattern of racketeering activity in the operation of two enterprises engaged in interstate commerce, House of Travel and Lokey & Bowden[94] (section 1962(a)); (2) by acquiring or maintaining, through a pattern of racketeering activity, an interest in or control over such enterprises (section 1962(b)); (3) by conducting or participating in the conduct of (as an employee or associate) the affairs of such enterprises through a pattern of racketeering activity (section 1962(c)); and (4) by conspiring to accomplish each of these objectives (section 1962(d)). The amended complaint, however, as in the case of the original complaint, does not explain how Zweifel purportedly did these things. For example, in claiming that Zweifel violated section 1962(a), the amended complaint does not identify any income that Zweifel obtained from a pattern of racketeering activity; nor, assuming that he obtained such income, does it explain how, if at all, he invested it in the two enterprises. In claiming that Zweifel violated section 1962(b), the amended complaint does not indicate how Zweifel acquired or maintained, through a pattern of racketeering activity, an interest in or control over House of Travel; nor does it describe such interest. The amended complaint does say that Zweifel had a partnership interest in the Lokey & Bowden enterprise, but it does not allege any facts from which one could infer that he acquired or maintained his partnership interest in that enterprise through a pattern of racketeering activi-

---

92. Nowhere in his briefs to us, however, does Pelletier acknowledge that count one asserts *four* RICO violations, of 18 U.S.C. §§ 1962(a), (b), (c), and (d), not *one.*

93. Pelletier attempted to do the same thing in his original complaint.

94. In his original complaint, Pelletier alleged that Zweifel invested such income in a third enterprise as well, the Bankruptcy Court for the Northern District of Georgia. He deleted this allegation when he filed his amended complaint.

ty.[95] In claiming that Zweifel violated section 1962(c), the amended complaint does not indicate how, if at all, Zweifel, as an employee or associate of House of Travel and Lokey & Bowden, conducted, or participated in the conduct of, the affairs of those enterprises through a pattern of racketeering activity. To be sure, the amended complaint alleges that Zweifel engaged in such conduct, but the allegation is nothing more than a bald conclusion. To discern whether, in fact, Zweifel engaged in the proscribed conduct, one has to look to the exhibits attached to the amended complaint and then attempt to make the factual allegations Pelletier failed to make. These exhibits, considered in the light of Pelletier's conclusion that Zweifel violated section 1962(c), suggest, perhaps, that Zweifel, as House of Travel's lawyer and as a Lokey & Bowden partner, furthered the business purposes of these two enterprises by conspiring with Culpepper to find working capital for House of Travel, and thus fees for Lokey & Bowden; such a conspiracy purportedly constituted an act of racketeering and, assuming that the act was part of a pattern of racketeering activity,[96] the conduct of the enterprises' affairs through a pattern of racketeering. Finally, in claiming that Zweifel violated section 1962(d), the amended complaint does not indicate how an unexecuted conspiracy to violate sections 1962(a), (b), and (c), which is all that section 1962(d) requires to make out an offense, could have "injured [Pelletier] in his business or property." *See* 18 U.S.C. § 1964(c).

The remaining counts are no easier to decipher, as our discussion rejecting Pelletier's multiple RICO claims discloses.[97] As we did in assessing the merits of the RICO claims, we undertook the task of reading these counts in the light of the four volumes of evidentiary exhibits incorporated into the amended complaint by reference to discern whether any of them stated a claim for relief. We found that none had merit.

Pelletier's briefs to us on appeal[98] are also unilluminating; they do nothing more than contend, in a conclusory manner, that the district court erred in rejecting his claims. In a sense, his briefs give less guidance as to which facts support which of his claims than do his complaints. They merely state in a conclusory fashion, as the complaints do, that Zweifel violated the law and then leave us with the task of combing the record to determine whether the district court erred as Pelletier contends. One could reasonably conclude, after reading Pelletier's briefs, that he takes neither of these appeals very seriously—that his briefs are simply "throw away" briefs.

In deciding whether Pelletier has prosecuted this case in bad faith, we have rejected the thought that his two complaints, and his briefs to us, might be the product of incompetent lawyering, and thus excusable, rather than tools of harassment. We have done so because Pelletier is skilled in the

95. Zweifel charged House of Travel fees for legal services performed, but there is no allegation that such fees enabled him to maintain his partnership interest in the firm.

96. This is an assumption that we cannot draw from the amended complaint and the incorporated exhibits, but do for sake of discussion.

97. Even in his brief before this court Schlanger does little to clarify which facts support which claims. *See also infra.* For example, he gives the following explanation of the Georgia RICO claim:

> The district court also dismissed Mr. Pelletier's Georgia RICO act claim, O.C.G.A. § 16–14–1, because
>> Count Eight alleges a violation of the Georgia RICO Act, O.C.G.A. § 16–14–1, et seq., but does not allege how the Georgia RICO

Act was violated. While one might assume that the complained of acts would mirror those identified as relevant to the similar federal cause of action, the great breadth of the RICO statute renders this approach unacceptable.
>> It is clear, however, that the *facts* underlying the predicate acts which give rise to the Georgia RICO claim are sufficiently alleged and, therefore, the claim should not have been dismissed.

(Citation omitted.) In a footnote, Schlanger also observes that "the barratry and false statements claim [sic] also lay the groundwork for two additional predicate acts under the Georgia RICO statute." These claims, however, also rely generally on the facts pled.

98. Pelletier has submitted two briefs: an appellant's brief in appeal No. 89–8334 and an appellee's brief in appeal No. 89–8667.

law, and, moreover, had been warned (through Schlanger) by a bankruptcy judge and a United States district judge that if he continued to pursue Zweifel, and his law firm, he was likely to run afoul of Rule 11. An indication of how far Pelletier was willing to go to extract a settlement from Zweifel is his allegation, in support of the federal RICO count of the original complaint, that Donald Rickertsen, the attorney who handled House of Travel's chapter 11 proceeding, and Frank Carmines and Charles Crumley, the examiner and auditor who were involved in that proceeding, conspired with Zweifel to conduct the affairs of the bankruptcy court, an alleged "enterprise," through a pattern of racketeering activity in violation of section 1962(d).[99] This allegation is absolutely baseless, and Pelletier knew this when he made it. The only reason Pelletier could have had for charging Rickertsen, Carmines, and Crumley with violating the federal RICO statute would be to bring about a quick settlement. Rickertsen, Carmines, and Crumley, concerned that being labeled RICO coconspirators might damage their professional reputations, would want the case terminated at the earliest moment, with as little publicity as possible, and they would put pressure on Zweifel to settle. When, however, Judge Tidwell told Schlanger that he was "treading on mighty dangerous grounds," a warning from which Zweifel could take comfort, Pelletier's chances for a quick settlement evaporated, and he abandoned his ploy. When he filed his amended complaint, he deleted his charge that Rickertsen, Carmines, and Crumley had conspired with Zweifel and used the bankruptcy court to violate the RICO statute.

Our conclusion that Pelletier brought this suit purely for the purpose of harassing Zweifel and forcing a quick settlement does not answer the question whether Schlanger has prosecuted this case in bad faith. We determine that he has done so,

however, because he knew from the start that Pelletier's claims were frivolous. As we have recounted, Schlanger's involvement with Pelletier and House of Travel began in mid-January 1985 when Pelletier convinced him to represent the Hurst Group in its suit against Culpepper for the specific performance of Culpepper's promise to transfer 40 of his House of Travel shares to the Hurst Group. Pelletier explained the arrangement that he had made with the Hurst Group when he purchased its shares; he would prosecute the suit, and if the Hurst Group won, it would transfer to him the shares it received from Culpepper. Schlanger thereafter represented Pelletier and the Hurst Group, as Pelletier's nominee, in every facet of Pelletier's dispute with Culpepper, ending with the Elite transaction—when Pelletier sold his House of Travel shares and dismissed his suits against Culpepper. In sum, Schlanger knew as much as Pelletier did about the transactions that gave rise to this lawsuit; what he did not know from first hand observation—principally, the circumstances leading up to and surrounding Pelletier's transaction with the Hurst Group—he learned in full from Pelletier and his lawyers at Alston & Bird, Conner and Bassett. Schlanger consequently knew—well before he filed the original complaint in this case—that neither Culpepper nor Zweifel had defrauded Pelletier.

We recognize that sometimes the attorney's responsibility for his client's frivolous claims may be tempered by impediments to a thorough factual inquiry—a court, for example, in determining whether Rule 11 sanctions are warranted may consider whether the attorney accepted the case by referral from another member of the bar, the time he had to investigate the claims, the extent to which he was forced to rely on his client's version of the facts, the

99. Pelletier also alleged, as part of his federal RICO count, that Zweifel, Rickertsen, Carmines, and Crumley, acting as coconspirators, also violated section 1962's substantive provisions—those contained in subsections (a), (b), and (c). As we note in the text *supra*, Pelletier alleged that Zweifel and his coconspirators used three enterprises—House of Travel, Lokey & Bowden, and the Bankruptcy Court for the Northern District of Georgia—as vehicles for violating all four criminal provisions of section 1962.

complexity of the facts, and the extent to which factual development required discovery. *See supra* note 88. None of these impediments is present in this case;[100] Schlanger simply had no justification for presenting these frivolous claims to the district court. Schlanger, as noted, was intimately involved in most of the transactions and events that gave rise to this suit. He not only had adequate time to investigate Culpepper's and Zweifel's conduct—he was an eyewitness to much of it; he was able to learn what had transpired without relying upon the credibility, or perceptiveness, of his client. *See Thomas v. Evans,* 880 F.2d at 1243.[101]

**2.**

Monetary sanctions plainly are warranted in this case. All of the claims Pelletier made clearly fall below the standard of reasonableness required by Rule 11. While these claims were frivolous when made, they became even more so as discovery proceeded and it became apparent that Pelletier's own evidence contradicted his factual allegations. If any doubt remained following discovery, it surely was removed when the Georgia Court of Appeals held that Pelletier had never been a House of Travel shareholder. *See supra* p. 1495.

100. As we indicate in the text *supra*, Schlanger was not present when Pelletier and Culpepper met in December 1984 to discuss Pelletier's possible acquisition of the Hurst Group's stock, when the Pelletier/Hurst Group transaction closed, and at the January 8, 1985 meeting in Conner's law office, when Culpepper refused to sign the contract Conner had prepared. These events transpired before Schlanger came on to the scene in mid-January 1985. Schlanger, therefore, had to rely on Pelletier's and Conner's versions of these events and the letter Pelletier wrote to Bassett on January 9, 1985, explaining what had transpired on such occasions. These sources informed Schlanger that Pelletier had taken a calculated risk when he bought the Hurst Group's stock without first obtaining Culpepper's signature on a management contract. Schlanger thus knew that Pelletier had not relied on Culpepper's "promise" to give him control of House of Travel's affairs.

101. Schlanger must have realized, when he filed the original complaint in this case, that if the case went to trial he would not be able to serve as Pelletier's trial counsel. ABA Model Rule of Professional Conduct 3.7 instructs attorneys not to serve as advocates in trials in which they are likely to be necessary witnesses except where their testimony relates to an uncontested issue or the nature and value of the legal services rendered in the case, or their disqualification, as trial counsel, would work substantial hardship on their client. At a trial of Pelletier's claims, Schlanger's testimony would be necessary—either in the plaintiff's case, to prove Pelletier's claims, or in the defendant's case, to rebut those claims—in several material respects. For example, Schlanger was intimately involved in House of Travel's chapter 11 proceeding and the Elite transaction. He counseled Pelletier to ratify Culpepper's filing of the chapter 11 petition, and therefore knew that Pelletier could not have been injured as a result of Culpepper's action; he also negotiated, for Pelletier, the terms of the Pelletier/Elite/Carson/Culpepper contract, in

which Pelletier agreed to the dismissal of the two state court suits he was prosecuting against Culpepper: the shareholders' derivative suit and the Hurst Group's suit for specific performance. Pelletier alleges, in his count one RICO claim, that Zweifel and his coconspirators, Culpepper and the others involved in the chapter 11 proceeding and the Elite transaction, defrauded him during the chapter 11 proceeding—by getting him to waive the Hurst's objection to Culpepper's commencement of the proceeding and, then, to sell his House of Travel shares to Elite. It is plain that Schlanger, having been intimately involved in these transactions, would have to testify at trial. First, Schlanger would have to testify that the filing of the chapter 11 petition caused Pelletier no injury—because he counseled Pelletier to consent to the filing. Second, Schlanger knew all of the facts material to the Elite transaction; hence, his client, Pelletier, could not have been fraudulently induced to consummate it.

Schlanger would also have been a likely witness on the question of whether the Hursts were acting as Pelletier's nominees or independently when they voted on the matters Schlanger had them bring before House of Travel's board of directors in March 1985. Finally, Schlanger would have had to testify as to when he learned that the Hurst Group, whom he was ostensibly representing, had no House of Travel shares to sell to Pelletier on December 29, 1984, because they had already sold them to TI.

The record does not disclose whether Zweifel or the district court ever called Model Rule 3.7 to Schlanger's attention, so that Pelletier could obtain another attorney to substitute for Schlanger if the case went to trial. We simply have to assume that, had the matter proceeded to trial, the district court, if not Zweifel, citing Model Rule 3.7, would have asked Schlanger to step aside. At that point, whether Pelletier could have persuaded another lawyer—fully acquainted with the material facts—to take over the trial would be another question.

We think that imposing sanctions in this case would serve the dual purpose of deterring the filing of frivolous claims and defenses while not chilling attorneys' legitimate enthusiasm and creativity in advancing legal and factual theories. At a time when the federal courts—which are a scarce dispute resolution resource, indeed—are straining under the pressure of an ever-increasing caseload, we simply cannot tolerate this type of litigation. Particularly with regard to civil RICO claims, plaintiffs must *stop and think* before filing them. If used correctly, the civil RICO provisions may have many salutary effects. When used improperly, as in this case, those provisions allow a complainant to shake down his opponent and, given the expense of defending a RICO charge, to extort a settlement. Such improper use of the civil RICO provisions comes at the expense of the federal judiciary and those who need ready access to the courts.

The question arises as to whether the sanctions imposed in this case should fall on Pelletier and Schlanger equally or whether we should have the district court determine their relative culpability and apportion the sanctions between them. We conclude that Pelletier and Schlanger are equally culpable; therefore the sanctions should be borne by them equally—they should be liable, jointly and severally, for the full monetary amount of the sanction imposed. With respect to the amount of the sanction, we direct the district court, upon receipt of our mandate, to award Zweifel a sum of money that will compensate him for the attorney's fees, litigation expenses, and costs he incurred in defending this lawsuit in the district court and in prosecuting his motion for Rule 11 sanctions. Such award shall take into account any fees, expenses, and costs Zweifel may incur, on remand, in obtaining the award.

We acknowledge that the present predicament is, in part, the product of the district court's failure to require Pelletier to replead his case in accordance with the Federal Rules of Civil Procedure. In a case such as this one, the trial judge should intervene at the earliest possible moment in the proceeding and, faced with a complaint such as the one filed here, should require that the plaintiff replead his entire case.[102] If he does not, the defendant, and the court, must decipher the pleadings as best they can—with the expenditure of much time and effort. Had, however, the district court required a repleader on all counts of the amended complaint, we are confident that Pelletier's case would have received the early demise it deserved.[103]

The district court's failure to require repleading in this instance does not, however, excuse, or mitigate, Pelletier and Schlanger's presentation of these unfounded claims. From the outset, they were warned that the claims were frivolous. As we have observed, one month after the complaint was filed, Judge Tidwell warned Schlanger that he was "treading on mighty dangerous grounds" and asked whether he was "familiar with Rule 11." Six months later, the bankruptcy court's special examiner filed his report. That report, which the bankruptcy court adopted, informed these litigants that they would run a substantial risk of incurring Rule 11 sanctions if they filed a suit based on claims essentially identical to the claims they have made here. Given these warnings, Pelletier and Schlanger must accept the full responsibility for their acts.

---

**102.** Similarly, the court should intervene and require a repleader when the defendant presents an answer or counterclaim that cannot be understood.

**103.** If Pelletier had refused to comply with the court's directive to file a repleader in conformity with the rules of civil procedure, the court could have dismissed the complaint under Fed. R.Civ.P. 41(b), on the ground that Pelletier failed to comply with Fed.R.Civ.P. 8(a) and (e) to provide a short, clear, and concise statement of the claim, Fed.R.Civ.P. 8(a), (e); *see Hatch v. Reliance Ins. Co.,* 758 F.2d 409 (9th Cir.), *cert. denied,* 474 U.S. 1021, 106 S.Ct. 571, 88 L.Ed.2d 555 (1985) (affirming dismissal of pleading that was long, confusing and conclusory); *Nevijel v. North Coast Life Ins. Co.,* 651 F.2d 671 (9th Cir.1981) (affirming dismissal of pleading that was verbose, confusing and almost entirely conclusory); *Schmidt v. Herrmann,* 614 F.2d 1221 (9th Cir.1980) (district court properly struck pleadings where the pleadings were confusing, distracting and ambiguous).

## V.

Rule 38 of Federal Rules of Appellate Procedure provides that "[i]f a court of appeals shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee." For the reasons stated in parts III and IV, we are convinced that Pelletier's appeal is frivolous. Of particular concern to us, in deciding whether Rule 38 sanctions are in order, is that Pelletier and Schlanger continued to press forward with their securities fraud claims, not only with no evidence of fraud, but also with compelling evidence that Pelletier never purchased any House of Travel stock—a purchase being an indispensable element of the claims. Pelletier was first put on notice when the Hurst Group could not give him a stock certificate after he purchased its House of Travel shares on December 29, 1984. Then, the Hurst Group, Schlanger's "client" at the time, received written notice on March 12, 1985 that TI was rescinding its stock purchase agreement. It may be that no member of the Hurst Group informed Schlanger of TI's notice, and that it had no stock to sell Pelletier on December 29, 1984, but certainly by the fall of 1987, when Zweifel discovered the TI sale and informed the district court, Schlanger, and thus Pelletier, knew that Pelletier's status as a House of Travel stockholder was highly questionable. Any lingering doubts were dispelled by the Georgia Court of Appeals' decision, in Lokey & Bowden's appeal, in June 1989. In August 1989, however, while this case was pending on appeal, Schlanger, and Pelletier, continued to assert the securities fraud claims *without calling the Georgia Court of Appeals' decision to our attention.* Indeed, we did not learn about that decision until Zweifel mentioned it in his brief. At oral argument, Schlanger ignored the decision again, until he was asked about it by a member of this court. Only then did he admit that he had known of the decision (he had represented Pelletier in the Georgia Court of Appeals) and that, under principles of collateral estoppel,

it rendered the securities fraud claims meritless.

We do not hesitate one whit in awarding Zweifel double costs and a reasonable attorney's fee for opposing Pelletier's appeal. *See* Fed.R.App.P. 38 advisory committee note. On remand, the district court shall determine the amount of that fee and give Zweifel judgment for the full amount thereof against Pelletier and Schlanger, jointly and severally.[104]

## VI.

For the foregoing reasons, we affirm the district court's judgment in favor of Gary Zweifel, reverse its order denying sanctions under Rule 11, and remand for further proceedings in accordance with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED with instructions.

---

**104.** In assessing the attorney's fee, the district court shall not compensate Zweifel for his attorney's services in prosecuting his appeal from the district court's order denying Rule 11 sanctions.